[Civ. No. 3142.  Third Appellate District.—December 30, 1926.]

A. M. JOHNSON, as Administratrix, etc., Respondents, v. F. D. STUDLEY et al., Appellants.

[1]  CONTRACTS—CANCELLATION—PERSONAL SERVICES—ESTATES OF DECEASED PERSONS—FRAUD — UNDUE INFLUENCE — EVIDENCE — FINDINGS.—In this action by the administratrix of the estate of a deceased person to set aside and cancel a written contract by the terms of which deceased conveyed certain real and personal property to defendants upon their agreement to provide a home and care for deceased during his lifetime, it is held that the evidence was insufficient to support the finding of the trial court that defendants practiced deceit or resorted to misrepresentations, or other fraudulent conduct, to induce deceased to execute the conveyances.

[2] ID. — EXECUTION OF CONTRACTS—THREATS—EVIDENCE—FINDINGS. In such action, the finding of the trial court that defendants by threats coerced deceased into making the agreement and executing the conveyances was without evidentiary support.

[3] ID. — CONFIDENTIAL RELATIONS — INDEPENDENT ADVICE. —In such action, there was no ground for the application of the principle of independent advice where there was not, prior to the making of the agreement, a fiduciary or other confidential relation existing between deceased and defendants.

[4] ID.—SUFFICIENT COMPLIANCE WITH RULE REQUIRING INDEPENDENT ADVICE—EVIDENCE.—In such action, the rule requiring independent advice, if applicable, was fully met where, before the agreement was consummated and prior to its being reduced to writing, the effect of the agreement was explicitly explained to deceased by a banker in whom he had full confidence.

[5] ID.—MENTAL CAPACITY — EVIDENCE — FINDINGS.—In such action, the finding that deceased was mentally incapable of fully appreciating the seriousness of the transactions or their effect upon his property rights was unsupported by the evidence, which showed without contradiction that deceased, during all the time that the transactions were under discussion and at the time they were executed, was mentally sound and fully realized and appreciated their nature and the effect thereof, so far as they affected him, and that he had conversed rationally with others and frequently declared to them or in their presence that he was perfectly satisfied with the proposition to turn his property over to defendants.

[6] DEEDS—AGE OF GRANTOR—MENTAL CAPACITY—UNDERSTANDING OF NATURE OF TRANSACTION — PRESUMPTIONS. — It does not follow from the mere fact that a person has reached or passed the age of seventy years that he has become mentally weak to the extent that he is incapable of attending to important business affairs intelligently or with full understanding of the nature thereof; and that fact alone affords no presumption that a grantor is incapable of understanding the nature of a transaction or of his being without sufficient mental power or volition · to resist the importunities of one attempting to take advantage of him in a deal involving the proposed transfer of his property.

[7] ID. — CONVEYANCE OF PROPERTY IN EXCHANGE FOR PERSONAL CARE — PHYSICAL ILLNESS — UNDUE INFLUENCE—EVIDENCE.—The mere fact that the grantor was afflicted with a serious physical malady at the time of the execution of a conveyance of his property to others upon consideration that they would provide

3.   See 4 Cal. Jur. 780; 9 Cal. Jur. 230.
6.   See 9 Cal. Jur. 225; 8 R. C. L. 944.

a home and care for him during his life does not justify the conclusion that the conveyance was executed by him against his will or as a result of the exercise of undue influence by the grantees, or without full understanding on his part of the nature and effect thereof.

[8] ID.—CONSIDERATION—TIME.—The sufficiency of the claimed consideration of a conveyance attacked on the ground that it was procured through fraud and undue influence must be determined from the facts of the transaction as they existed when the contract was made, rather than by subsequent developments.

[9] ID.—PERSONAL SERVICES — ADEQUACY OF CONSIDERATION—VALIDITY OF CONVEYANCE—EVIDENCE.—In this action by the administratrix of the estate of a deceased person to set aside and cancel certain conveyances by her intestate of all his real and personal property to defendants upon their agreement to provide a home for him during his lifetime, the fact that said conveyances were made at a time when it was possible that the grantor might live for years, although he in fact died within a few months after the execution thereof, would not constitute sufficient ground for vitiating the conveyances for inadequacy of consideration, where defendants at the time of entering into the agreement could not know or determine how long they would be required to care for the grantor, and one of them forfeited all opportunity for work at his trade as a carpenter and gave himself over entirely to caring for the grantor.

---

(1) 9 C. J., p. 1256, n. 31, p. 1257, n. 38.   (2) 9 C. J., p. 1257, n. 32; 13 C. J., p. 262, n. 66; 18 C. J., p. 219, n. 60.   (3, 4) 13 C. J., p. 407, n. 68, 72.   (5) 9 C. J., p. 1257, n. 35; 13 C. J., p. 262, n. 65, 66.   (6) 22 C. J., p. 146, n. 50.   (7) 18 C. J., p. 443, n. 19. (8) 18 C. J., p. 166, n. 21, p. 168, n. 42, p. 442, n. 7.   (9) 18 C. J., p. 168, n. 42 New.

APPEAL from a judgment of the Superior Court of Riverside County.   George R. Freeman, Judge.   Reversed.

The facts are stated in the opinion of the court.

Best & Best and Richard J. Welch, Jr., for Appellants.

Richardson & Scherrer for Respondent.

HART, J.—The administratrix of the estate of Ola Bentson, deceased, the plaintiff, brought this action to have set aside and canceled a certain written contract, by the terms of which the deceased executed and delivered to defendants a

quitclaim deed conveying to them certain real property and
for like relief as to said deed, also as to an assignment of
a certain mortgage in which the deceased was the mortgagee,
and further as to a promissory note executed and delivered
by the defendants to the deceased.

The cause was tried by the court, sitting without a jury,
and judgment for the full relief prayed for was awarded
plaintiff.

The defendants appeal from the judgment upon a record
prepared in accord with the so-called alternative method.

The following is the agreement:

"This Agreement, made and entered into this twentieth
day of February, 1923, by and between F. D. Studley and
Ola Bentson.

"Witnesseth that the said Ola Bentson, on his part and
for valuable consideration herein as mentioned, does agree
to give clear deed to the following described real estate:

"House and three lots, described as lots 17–18–19. Frames
resubdivision of block 27 original townsite of Elsinore.

"He also agrees to make a proper assignment of a note
and mortgage for three thousand dollars ($3,000) which said
note and mortgage is dated April 1st, 1919, and due in five
years with interest at six per cent; said note and mortgage
are executed by Thomas O. and May R. Boothby; and one
note of said F. D. Studley in favor of Ola Bentson for three
hundred dollars ($300) and assignment of mortgage and
deeds are hereby acknowledged by said F. D. Studley and
for the above and other valuable considerations which partly
consists of six bonds of the Nevada California Electric Com-
pany for one hundred dollars ($100) each, total six hundred
dollars ($600) receipt of which is also acknowledged for the
above considerations. The said F. D. Studley agrees on his
part that he will care for and provide a good and confortable
home in the town of Elsinore for the said Ola Bentson and
that he will care for him in sickness and in health in a good
and proper manner, paying all expenses of living, clothing,
doctor's bills and any other expenses that might be necessary
for the comfortable care and protection for the said Ola
Bentson so long as he may live and give him a reasonably
fair burial at the time of his death, at his own proper cost
and expense and these transfers assignments, etc., of the
deeds and bonds and notes shall also pay the said F. D.

Studley for all past services that he has already rendered to the said Ola Bentson. *It is understood that all interest and rent accruing from the above property is to belong to Mr. Bentson during his life for his own personal use.*

"Given under our hands and seals the day first above written.

> "F. D. STUDLEY
>
> "OLA BENTSON

"Witness to the signatures of the said F. D. Studley and Ola Bentson.

> "R. J. HORTON
>
> "G. R. GOUGH"

On the day of the execution of said agreement (February 20, 1923), the deceased executed and delivered a deed, duly acknowledged, quitclaiming to the defendants lots 17, 18 and 19 in "Frames resubdivision of the original townsite of Elsinore." This deed was filed for record and recorded in the office of the county recorder of Riverside County on the second day of April, 1923.

On the same day the deceased in writing assigned to the defendants a certain mortgage executed by Thomas O. Boothby and his wife on certain real property situated in Riverside County and given to secure a promissory note for the sum of $4,000. This mortgage was executed on April 1, 1919, and the note to secure which it was given was made payable five years from date. At the same time the deceased canceled a promissory note for the sum of $300, executed and delivered by the defendants to deceased.

The complaint charges that the above-mentioned documents were procured from the deceased by the defendants through fraud and the exercise of undue influence. It is alleged, among other things, that at the time of the execution of said instruments the deceased was afflicted with Bright's disease of the kidneys and "so weakened mentally and physically thereby that his death could be expected within a few weeks or months and which did actually take effect shortly thereafter and that under such conditions his will and mind were easily susceptible to the undue influence of the will and mind of said defendants"; that said deceased was under the exclusive care, charge, and control of said defendants, and that by reason of his "extreme old age," his mental and physical weakness and infirmity, due to the disease men-

tioned, defendants did then and there exercise and practice upon said deceased undue influence and thereby succeeded in inducing him to execute the instruments above mentioned. The details of the alleged fraud and undue influence are set forth in paragraph XIII of the complaint. The court adopted substantially said paragraph as part of its findings. These allegations will be set forth herein as they are adopted by the court in its findings.

The answer admits the execution of the agreement, the deed, and the assignments, but specifically denies that the same were procured by fraud or undue influence on the part of the defendants. The finding just referred to reads as follows:

"With respect to the allegations contained in Paragraph Number XIII of plaintiff's Complaint, the Court finds: That at all the time immediately preceding the making and execution of said purported contract and said purported deed, the said Ola Bentson, had a home and house of his own sufficiently furnished to keep him in the station and condition of life that he then had been previously enjoying, and sufficient money and financial means to pay these defendants herein for any services in taking care of and nursing him, and for any food and clothing furnished by them or necessary for his then immediate care and comfort, and to pay these defendants well for such services and for the furnishing of any food and clothing necessary for the then immediate care and comfort of himself; that said Ola Bentson during all of such time was fully cognizant of his ability to so financially pay and otherwise provide himself with such care, comfort and food and clothing as aforesaid, and having knowledge of his financial ability to so pay for such services, care, food and clothing as aforesaid, did then and there, and on many divers occasions previous thereto, offer and propose to said defendant F. D. Studley, that if he, said F. D. Studley and wife, would so take care of and nurse him, and provide him him with the necessary food and clothing, he, Ola Bentson, would pay them, and pay them well for it, and for him, Studley, to name the price; but, said F. D. Studley and wife having as hereinbefore found in these findings conceived the plan of obtaining title and possession to the whole of the valuable real and personal property of said Ola Bentson, and knowing that to accept said Ola Bentson's offer and proposal as

aforesaid would prevent the consummation of their said plan, did then and there, and on many diverse occasions previous thereto, refuse and decline said offer and proposal, and did then and there, with the intent and purpose of carrying out said consummation of said preconceived plan as hereinbefore found in these findings, and having then the opportunity to take advantage of the fact that said Ola Bentson was under their exclusive care, charge and control and of his old age, fatal illness, mental weakness, distress and necessities as hereinbefore in these findings found, and having, then and there and therefore sought and gained legal advice and counsel for themselves, and sought and gained the advice and counsel of the physicians then in attendance upon said Ola Bentson as to the probable length and duration of his life, and having, then and there, and on diverse occasions previous thereto, sought and had a Notary Public come to their home for the purpose of drawing, preparing and acknowledging said purported contract and said purported deed, the said defendant, F. D. Studley, did then and there, and at the time of the making and execution of said purported contract and said purported deed prevail upon and importune the said Ola Bentson, to make and execute said contract and said deed against his will and without his consent, and said Ola Bentson was caused to so do by the previous threats, coercion and undue influence of said F. D. Studley and to the continuance thereof at the very time he made said purported contract and said purported deed used to and upon him by said Studley who did then and there, state and threaten that, unless he, said Ola Bentson, so made and executed said purported contract and said purported deed, that he, Studley and wife would immediately cease taking care of him, nursing and providing him with food and clothing, and said Ola Bentson thus put in fear that said defendant Studley would carry out said threats as aforesaid and he and his wife would desert and abandon him, and no longer administer to his immediate wants and necessities, and sick and unable to move or walk about unless assisted, and in such distress of body and mind as hereinbefore alleged and as in these findings found, and under the exclusive care, charge and control of said defendants and no immediate opportunity available to him to seek or hire others to perform such services for him, submitted to said threats, coercion and undue influence of said defendant

Studley as aforesaid, and did make and execute said pur-
ported contract and said purported deed, which said contract
and said deed so made and executed as aforesaid, was and
were so made wholly without adequate or any consideration
whatsoever, and the act of making said purported contract,
and the act of making said purported deed, was, and were
not the free and voluntary act or acts or deed or deeds of
said Ola Bentson, but was and were the result and consum-
mation of the acts and deeds of said defendant, F. D. Stud-
ley, and his said undue influence exercised by him to and
upon the will and mind of said Ola Bentson, who then on
account of his mental weakness, old age, infirmity, sickness,
distress and necessities as aforesaid, and of his then relation
and association with said defendants, was unable to resist the
desires and importunities of the dominant mind and will of
said defendant, F. D. Studley.''

The court also found that the property, real and personal,
turned over to the defendants by the deceased as indicated
above was of no greater value than $12,000.

The contention of the defendants is that the findings as
to fraud and undue influence and the foregoing finding are
wholly without any support from the evidence. We think
the contention must be sustained.

The facts as we shall state them are gleaned from the
uncontradicted testimony in the case. The plaintiff's intes-
tate, at the time of the execution of the transactions sought
to be annulled by this action, resided in the town of Elsinore,
in Riverside County, and was of the age of seventy-nine
years. He was an unmarried man. It is not made to ap-
pear, except in a general and indefinite way, that he had any
relatives in Elsinore or elsewhere. The petition by the plain-
tiff for letters of administration of the estate of the de-
ceased or the other proceedings in connection therewith are
not in the record, and we are hence without information as to
the relationship, if any, of the plaintiff to the deceased.

The plaintiff's intestate, who hereinafter, for brevity, will
be referred to as ''the deceased,'' or ''Bentson,'' and the
defendants were near- neighbors in the town of Elsinore
for about four years prior to the date of the execution of
the contract and other instruments above mentioned, their
respective homes being separated by a small lot. The de-
ceased owned several lots in Elsinore—those named in the

deed from him to the defendants—and it appears derived a livelihood from raising thereon vegetables and chickens and selling the same to the market or such persons as desired to purchase them. He at times also performed labor for other people. The defendants are husband and wife, and lived on neighborly or intimate terms with the deceased for the period above stated. F. D. Studley was a carpenter by trade and worked thereat whenever his services as such were needed, and was paid for his labor at the rate of one dollar an hour, or eight dollars for eight hours' work. These wages were fixed according to the wage rate established after the entry of the United States into the war with Germany and the increase in the cost of living brought about by that event.

In the latter part of the year 1922 the health of the deceased began to fail. In November of that year, realizing the necessity for medical aid, he called in Dr. Parker, a local physician, who diagnosed and pronounced his physical ailment as that of Bright's disease of the kidneys. Down to that time the deceased, as thus he had done for the whole of the period of four years during which Studleys were his neighbors, as indicated, did his own cooking and in other respects attended to his household affairs. On one of his professional visits to the deceased in the month of November or December, 1922, Dr. Parker advised Bentson that his food, as he (Bentson) prepared it, was without sufficient nourishment, and that in his condition he should have some capable person to prepare his meals and take care of him generally.

In the month of November, 1922, one James H. Mills, with whom the deceased had been acquainted for about eight years, was employed by the latter to construct a cement walk around his three lots described in the deed from deceased to the Studleys. After starting the work of building the walks, Mills, on one occasion, found the deceased "in bed sick." The deceased then said to Mills that "he would like to have me hunt up someone that would look after him. So I took him up some broth a couple of nights," Mills proceeded to testify, "and I went down and saw Mr. Studley, and they agreed to look after him." F. D. Studley immediately called on the deceased and asked him what he (Studley) could do for him. Mrs. Studley soon followed her husband and the

deceased asked her to make some broth for him. "I know you are a good cook," said deceased, addressing Mrs. Studley. Mr. Studley then went to the butcher-shop, procured some meat and Mrs. Studley, at her own home, prepared some broth and took it to Bentson. At the end of a period of about ten days after the Studleys took upon themselves the care of the deceased, the latter had so far recovered his strength as to enable him to leave his bed and sit in a rocking-chair and occasionally take short walks about his premises. Mills testified that while the Studleys were taking care of the deceased at the latter's home, he (Mills) on several occasions called to see the deceased and found that he was receiving proper attention and care at the hands of the Studleys. F. D. Studley continued to wait on and care for the deceased for a period of about two months. Said Studley remained with the deceased, while Mrs. Studley, at her own home, prepared food for Bentson and took it to his (Bentson's) home. Studley testified: "I tried to get him (deceased) a housekeeper and succeeded after a while in getting a lady from Pasadena. She stayed there ten or eleven days. He hired her for a month. She went away and I got another lady to come there." F. D. Studley, after taking the last-mentioned woman to the home of the deceased and after he (Studley) had shown her where she could find the usual household equipments for caring for the house, returned to his home, but it appears that during that day he was informed by a groceryman who had but a few hours previously delivered groceries to the home of the deceased that he found the latter alone and unattended by anyone, the woman last employed by said Studley having for some reason refused to accept the employment and departed from the premises. Studley thereupon and immediately went to the home of the deceased, and asked the latter what he desired him (Studley) to do for him (deceased). Although, so he testified, he knew of no relatives that Bentson had, Studley suggested to the latter that he ought to call in any relative that he might have to attend and take care of him; or, if he had no relatives, to employ some man with a wife to take up his residence with him and give him the care and attention his physical condition required. Said Studley stated to the deceased that he (Studley) had on hand a

job as a carpenter and that it was necessary for him (deceased) to make definite arrangements for his care. The deceased thereupon proposed that the defendants assume that responsibility for a consideration. Studley testified: "Up to that time I never had charged him a penny for my services. I said 'Mr. Bentson, you could not afford to pay me what I could get elsewhere. If I go carpentering I can get my eight dollars a day. You would not want to pay that.' And he says, 'If you will take care of me I will give you all my property.' I says, 'Mr. Bentson, that is a pretty serious matter. You better think that over pretty well before you accept anything like that.' I says, 'If you would give me your property, how do you know but what I would turn around and kick you out?' He says, 'I know you well enough to know you would not do anything of the kind.' I says, 'Mr. Bentson, you think that matter over; don't be in a hurry about it. If there is anything else that I can do—my wife's condition is not very strong, and if you are both taken sick on my hands at the same time what would I do?' As near as I can remember, his answer was, 'I don't intend or want to be much trouble to anybody,' or something to that effect. I says, 'Mr. Bentson, there doesn't anybody know when they are sick how much trouble they are going to be to anybody else. You might be in bed for months. You would have to be waited on day and night. I really don't care to enter any contract. I would rather you would get someone else.' 'Well,' he says, 'I haven't anybody else that will do anything for me. I have got to have somebody.' And every time I would go there after that he would ask me in regard to taking care of him and I kept putting him off." Studley finally accepted the proposition, but said to Bentson: "I can't take care of you here," referring to Bentson's home. This arrangement was made in Bentson's house and upon a suggestion made by the deceased, John T. Kuhns, a former banker of Elsinore, but at the time referred to engaged in the real estate business and a notary public, was asked by Studley to call at the home of the deceased for the purpose of preparing a contract in accordance with said arrangement. At this point and, parenthetically, it may be remarked that the testimony of F. D. Studley that the deceased was the first to propose giving the Studleys all his property as a consideration for

taking care of him for the balance of his life is at variance with that of said Kuhns, whose testimony was in substance as follows: That F. D. Studley called on him and stated that Mr. Bentson wished to see him; that Kuhns, accompanied by Studley, started to the Bentson home and on the way Studley explained to Kuhns that the deceased desired to make some arrangement with him (Studley) for taking care of him during the remainder of his life, that they had thus far not agreed upon the terms upon which the Studleys were to take the contract; that when they arrived at the home of the deceased the latter and Studley proceeded to discuss the terms, the deceased insisting that the arrangement should be that the Studleys should take care of him for a stipulated sum of money, while Studley declared that he would not enter into a contract to take care of the deceased, as indicated, unless the latter would agree to turn over to him all his property, both real and personal, Studley stating that if he accepted the responsibility of caring for the deceased he would have to devote his entire time and attention to him and, therefore, would be unable to work at his trade as a carpenter so long as the deceased might live. No definite arrangement was made between the deceased and Studley on that occasion.

Kuhns the following day was again called to the Bentson home for the purpose of preparing an agreement. He stated that the deceased said, ''We haven't gotten along any further than we were last night. We haven't come to a decision yet.''

An agreement was finally reached between the deceased and F. D. Studley, whereby the deceased agreed to convey to the Studleys all his estate upon condition that they would provide for and take care of him during the balance of his life. Bentson thereupon (in the first part of January, 1923), and in pursuance of the said agreement, walked over to the home of the Studleys and there remained and was there taken care of by the defendants until he passed away on the tenth day of May, 1923.

R. J. Horton, president of the First National Bank of Elsinore, with which the deceased had always transacted his banking business, had on several occasions been present, both at the home of the deceased and the home of the Stud-

leys, after the deceased had been removed to the latter place early in January, 1923, when the matter of the proposed contract or proposed arrangement for the care of the deceased by the Studleys was under discussion. He testified that a short time before the contract was executed F. D. Studley called at the bank and informed him that he (Studley) and the deceased had finally agreed upon the terms upon which the Studleys were to take care of the deceased; that the deceased did not accompany said Studley to the bank on that occasion; that Studley explained to the witness that the agreement arrived at was that the Studleys were to take Bentson to their home and provide and care for him as long as he might live, and that the deceased, as a consideration therefor, was at once to convey to the Studleys all his property, both real and personal. Studley requested Horton to prepare a contract in accord with said terms, but the latter declined to do so, stating that he did not feel that he was capable of properly drafting a contract of such importance, and suggested that a lawyer be employed to do the work. Thereafter F. D. Studley employed an attorney at Santa Ana to put the agreement in writing. After the agreement was so prepared—about a week after the said conversation at the bank between Studley and Horton—Studley appeared at the bank with the contract in writing. Horton read the instrument. Subsequently (February 20, 1923), Horton was requested by Studley and also Bentson through Studley to call at the Studley home, where the deceased had in the meantime been taken, for the purpose of witnessing the execution of the agreement and taking the acknowledgment of the execution of the deed by Bentson conveying his real property to the Studleys in pursuance of the terms of said agreement, Horton being a notary public. Horton complied with the request and took with him to the Studleys on said occasion G. R. Gough, cashier of the bank of which the former was president.

Before the agreement, the deed and the assignments were signed by the deceased, Horton held a conversation with Bentson relative to the proposed transactions. "I told Mr. Bentson," Horton testified, "as plainly as I could just exactly what he was signing; that he was signing away all his property, and I told him he didn't want to do that without careful consideration." Bentson stated to Horton that he

required care and attention and that he had-concluded that the best thing for him to do was to enter into and carry out the agreement proposed by Studley· and as evidenced by the written contract; but, said Horton, Bentson manifested some reluctance—not "very strong reluctance," however— about signing the contract. In fact, Horton said the deceased insisted that a provision be added to the contract that "the earnings and proceeds derived from the property during his life" should belong to and be paid to him. Studley assented to this proposal and thereupon, at the request of Bentson, Horton inserted in the written agreement the provision, the language of which is in italics as the instrument is hereinbefore reproduced. This change in the contract, Horton said, seemed to "ease" Bentson's mind, and, remarking that he "might as well sign it now as any time," he thereupon subscribed his signature to the contract, the deed and the other instruments mentioned. Horton, as a notary public, took the acknowledgment and, as seen, the written agreement was witnessed by both Horton and Gough. While the conversation and transactions just referred to were going on Bentson was sitting in a chair.

G. R. Gough corroborated the testimony of Horton as to the conversation between the last named and the deceased on the occasion just adverted to and as to the warning Horton gave Bentson relative to the effect of the execution by the latter of the agreement, deed, etc.

At the time of the execution of the above-mentioned instruments the deceased had on deposit in the bank of which Horton was president approximately the sum of $500. He also then had in his safe deposit box in said bank Liberty bonds amounting to $900, Nevada-California Electric bonds of the value of $600 and the note and mortgage of Boothby, originally for $4000; but subsequently reduced by payments on the principal. These securities were convertd into cash through Horton's bank and the proceeds credited to the deposit account of the deceased. At the time the contract and other instruments were signed, Bentson instructed Horton to make a change in his account in the bank so that the Studleys, 'as well as himself, could draw on the account in his lifetime and "to make it so as to create a joint tenancy" in the account, to the end that "Mr. Stud-

ley, if Mr. Bentson should die, could get the money and pay his expenses,'' etc.   These instructions were in writing, as follows:

''For Checking o/o of
    Ola Bentson.          Term Account No............
        ''First National Bank of Elsinore.
           ''Elsinore, Cal.

''Find below duly authorized signature which you will please recognize in payment of funds or the transaction of other business on my, or our account:

           ''OLA BENTSON
           ''F. D. STUDLEY
           ''ESTELLE T. STUDLEY

''Sign here.
''Address ..........        Introduced by ............''

The instructions were not strictly followed by Horton, but, as to this, he testified that the card on which the instructions were written ''was the only signature card we had.   We were out of regular joint tenancy cards at the time.''   He stated that he did not at the time or at any other time tell Bentson that he had not made it appear in the records or books of the bank that the account was a joint tenancy account, but that he, as well as the deceased and Studley, treated it as such in accord with the specific instruction of Bentson to that effect.   Prior to and subsequent to the death of Bentson the Studleys checked on the account, appropriating much if not all the money to the payment of the expenses incurred in taking care of the deceased, and upon his death in payment of funeral expenses.   These considerations, however, are of no special consequence in the decision of this case.   The sole questions here are, as has been shown, whether the defendants procured the transfer of the property of the deceased, including the money in the bank and the securities referred to, through misrepresentations or fraud or the exercise of undue influence upon the deceased on the part of the Studleys, or either of them, and whether the deceased was mentally incompetent to transact the business. If under such circumstances the execution of the agreement and the transfer of the property of the deceased were accomplished the plaintiff would be entitled to recover all the property so transferred, regardless of the form in which the

transfer was made. It is consequently immaterial whether the effect of transferring and changing the account in the bank was or was not to create a joint tenancy in said account.

It should here be stated that Dr. Parker, who, as seen, professionally attended and prescribed treatment for the deceased, testified that he advised F. D. Studley, while the latter was waiting on Bentson at his (Bentson's) home as to the physical condition of the deceased "and what to expect. . . . I told them (the Studleys) that he (deceased) had chronic Bright's disease and could not get well; that he might live a few months or a few years. It was an uncertain condition." In this connection it may also be stated that F. D. Studley testified that he did not understand Dr. Parker to say the deceased "might live a few months or a few years," but understood the doctor to say that he might live for years. However, it is clear from Studley's testimony that he knew and realized that the deceased, at the time the transactions involved herein were under negotiation, was a very sick man and the disease from which he was suffering would probably sooner or later result in his death.

[1] The foregoing embraces a statement in substance of all the testimony revealing the circumstances attending and eventuating in the execution of the agreement and the other written instruments in question. It is perfectly clear therefrom that the testimony does not justify the conclusion that the defendants practiced deceit or resorted to misrepresentation or other fraudulent conduct to induce the execution by the deceased of the agreement and other papers. Indeed, the court below, in its decision, recognized this proposition, since it made no specific finding that the transactions were brought about through fraudulent representations or conduct on the part of the defendants. The fraud in the transaction, if any, is to be implied from the findings that the defendants, taking advantage of the physical and mental condition of the deceased, by threats, coerced the latter into the execution of the agreements, etc., and that, by reason of his advanced age and serious physical illness, the deceased, at the time the transactions were in process of negotiation and finally consummated, was mentally incapable of exercising volition or intelligently transacting business. [2] The finding, however, that the defendants by threats coerced the

deceased into the making of the agreement and the execution of the instruments transferring his property to the defendants is wholly without evidentiary support, as the above statement of the evidence plainly shows. Indeed, in a written opinion (incorporated in the clerk's record herein) the learned trial judge, referring to the testimony of Kuhns to the effect that on his second visit to the deceased the latter remarked, "Well, we haven't gotten along any further than we were last night—we haven't come to any decision," concisely stated the situation, as the evidence disclosed it, when he said: "This would indicate that Bentson and Studley were *driving a bargain;* that Bentson was trying to get Studley to take care of him, but they had not agreed at that time, after considering the matter for a day. This agreement was that Bentson wanted Studley to take a stipulated amount for his care, which he was willing to pay, and insisted that he wanted Mr. Studley to name the same. Studley always insisted that Bentson should convey all of his property to him, otherwise he would not consider it." If that statement of the judge constituted all there was of the findings, in so far as threats and coercion were concerned, the judgment would be entirely without a prop to uphold it in that particular; and, carefully scrutinized, the findings, so far as threats or other coercive methods are concerned, do not go much further than what is comprehended within that statement. The finding as to that matter is, in effect, that the defendants threatened that, unless deceased came to their terms, they would cease and refuse to take further care of him. Obviously, the defendants had a right to "drive a bargain" and the further right to refuse to care for the deceased unless he agreed to their terms as to the compensation for the services required, even though it were true that the contract thus exacted was unreasonable or called for compensation far beyond the value of the service to be performed. In other words, the proposal of the defendant and the acceptance thereof by the deceased might have constituted an improvident or unfair agreement, in so far as the deceased was concerned, and yet it was an agreement which the defendants had the legal, even if not the moral, right to demand and induce the consummation of, provided that they did not resort to misrepresentation or fraud to procure the same, and provided further that the

deceased was not mentally incompetent to transact such business or any of the business affairs of life with that degree of intelligence which would enable one to fully understand and realize the nature of the transaction and the consequences thereof.

[3, 4]   The trial court, in its decision, as do counsel for the respondent in their brief, stresses the proposition that the deceased, in carrying out the transactions, was without independent advice as to the nature and consequences to him of the proposed agreement. The undisputed evidence shows, as has been pointed out above, that Mr. Horton, president of the bank with which the deceased had for many years deposited his money, explicitly explained to the deceased, before the agreement was consummated and prior to its being reduced to writing, that the effect of the agreement, if executed by him, would be to transfer his entire estate to the defendants, and advised him to consider the proposition well before accepting it. If, therefore, this were a case where the relation of the parties was of a fiduciary or confidential character, the advice or caution thus given deceased by Mr. Horton, in whom we may assume the deceased had full confidence, since he had extensive dealings with him as a banker, would entirely measure up to the rule as to independent advice in such cases. The situation here, however, is not one to which the rule of independent advice is applicable. There was not, prior to the making of the agreement, a fiduciary or other confidential relation existing between the deceased and the defendants. (See *Robins* v. *Hope*, 57 Cal. 493, 497; *Hemenway* v. *Abbott*, 8 Cal. App. 450, 463 [97 Pac. 190]; 1 Story's Equity Jurisprudence, sec. 218; *Scattergood* v. *Kirk*, 192 Pa. 263 [43 Atl. 1030, 1032].) They were friends, it is true, and had been for several years, and no doubt the deceased had confidence in the integrity of the Studleys and believed that they, above all others with whom he was acquainted, would give him that care and attention which his physical condition demanded. This, however, did not constitute a confidential relation within the meaning of that doctrine as it is known to the law. The entire transaction, from its inception to its consummation involved a matter of contract only—no different in its general nature or the circumstances under which it was made from any other contract whereby one party agrees to perform certain

personal services for another for a specified or stipulated compensation and where such parties are strangers to each other, so far as relationship by consanguinity or affinity is concerned.

[5] The foregoing observations have proceeded upon the assumption that the deceased was mentally capable of transacting the business involving the transactions in controversy. But, as has been shown, the theory of the plaintiff, as is that of the decision below, is that, when the transactions in question were under consideration and finally executed, the mind of the deceased had become so impaired or weakened from the disease with which he was afflicted that he was mentally incapable of fully appreciating the seriousness of said transactions or their effect upon his property rights; or, in other words (and this is as far as the findings really go), that his weakened and mental condition rendered him easily and readily susceptible to pressure or the exercise upon him in the transactions of sinister influence by those in whom he had a high degree of confidence; that defendants, knowing of his impaired mental condition, took advantage thereof and, as to the deceased, thus succeeded in bringing about an unfair or unreasonable bargain. As we have already stated, however, there is no evidence in the record which warrants any such conclusion. To the contrary, the uncontradicted evidence clearly shows that during all the times that the transactions were under discussion between the deceased and F. D. Studley and at the time that they were executed, Bentson was mentally sound and fully realized and appreciated the nature of the transactions and the effect thereof, so far as they affected him. Some five or six witnesses testified that they were acquainted with the deceased in his lifetime, met him before and after he went to the Studley home, conversed with him and from their acquaintance with him and the character of the conversations held with him they were of the opinion that there was nothing the matter with his mentality; that he carried on his conversations intelligently and seemed to understand everything that was said to him, and was able to discuss the subjects to which the conversations related understandingly. We will not undertake to state herein in detail all this testimony, although some of it may be briefly referred to. Henry S. Drake and his wife met the

deceased at the home of the Studleys, where the Drakes visited for a week in the month of February and prior to the time of the making of the agreement and other papers herein involved. They testified that he not only carried on his conversations in a rational manner, but frequently declared to them or in their presence that he was perfectly satisfied with the proposition to turn his property over to the Studleys as a consideration for the care and attention which his illness required. Both stated that he was able to sit at the family table at meal times and said that he had declared that "he was very thankful to have people as good as Mr. Studley's folks to take care of him, for if he had not had the care that he had he would have been under the ground before that day." Henry S. Drake testified that the deceased stated that he was perfectly willing to turn his property over to the Studleys as a consideration for the aid that they were giving and intended to give him; that "he would not have anyone to have his property but Mr. Studley; . . . ; that there was no one in the old country he wanted to have his property." Dr. John S. Nation, a chiropractor located in Elsinore, testified that while the deceased was at the home of the Studleys, Mr. Studley brought him to his (the doctor's) office for treatment on several different occasions; that the deceased on one occasion stated to the doctor that "not being able to properly care for himself he proposed to have Mr. and Mrs. Studley care for him"; that they had been "very nice and good to him," and that he was going to leave them all the property he had; that he was "by himself" and had no one else to leave it to and that "he had made up his mind to leave what he had to Mr. and Mrs. Studley"; that he (witness), from his acquaintance and conversations with Bentson, formed the opinion that he was mentally sound—that he was sane. Banker Horton testified that the deceased seemed to him to be "mentally competent. He was as alert as the ordinary man mentally. I base my opinion upon my experience with him and my business transactions with him." Thomas O. Boothby testified that when he called on the deceased at the home of the Studleys for the purpose of making a payment of interest on his indebtedness to Bentson, the latter discussed the matter with Boothby as intelligently as he had ever discussed any business proposition with the witness and suggested to

Boothby that, since it was not convenient for him to go to the bank on account of his illness, he (Boothby) could pay the interest to Mr. Horton, who, Bentson then stated, was acting for him in his business matters.

There were several other witnesses who knew and had met and talked with the deceased prior and subsequent to the date of the execution of the transactions in dispute and who testified that they were of the opinion that the deceased was mentally sound and capable of carrying on business in an intelligent way during the period of time covered by the negotiations and the consummation of said transactions.

But, it seems to us, more convincing evidence of the mental competency of the deceased and his ability to take good care of his own interests in the transactions could hardly be thought of than the fact that he deliberated and "bargained" several days before he came to the terms of the Studleys and finally signed the agreement and the other papers, and refused or, rather, as the witness Horton expressed it, "showed reluctance," to sign the papers until there was inserted in the agreement upon his suggestion and insistence a provision to the effect that he was to receive the rents, issues, and profits derived from his estate during his lifetime, and that when Horton inserted a provision in the agreement to that effect, the mind of Bentson appeared to be at "ease." Manifestly, a man of weak mind or who was unable, by reason of a debilitated mind, to protect well his own interests or to express his real wish or intention in a transaction of such importance, would not have carried on the affairs involved herein with the degree of deliberation exhibited by the deceasd therein.

[6] An investigation of the record will force the conclusion that the court below planted its decision entirely upon these propositions, to wit: That, by reason of the fact that, at the times the transactions in question were under negotiation and ultimately completed as indicated, the age and serious illness of the deceased had so broken down or impaired his mentality that he was, at said times, mentally incapable of transacting business understandingly or with the ability to fully appreciate the nature thereof and its consequences to him, or at least easily influenced. That the Studleys had the confidence of the deceased and could, therefor,

the more readily impose upon or lead him into the making of an unfair or unconscientious bargain. Indeed, that these, together with the fact, as the court conceived it, that the consideration moving from the defendants to the deceased for the agreement and the transfer of his property under the terms of the agreement was inadequate, were the evidentiary factors persuading the trial court to its decision, is clearly disclosed in the discussion of the facts of the judge's written opinion filed with the record here. But it does not follow from the mere fact that a person has reached or passed the allotted three score and ten years in age, that he has become mentally weak to the extent that he is rendered incapable of attending to his important business affairs intelligently or with full understanding of the nature thereof. In other words, that fact alone affords no presumption of a grantor being incapable of understanding the nature of the transaction or of his being without sufficient mental power or volition to resist the importunities of one attempting to take advantage of him in a deal involving the proposed transfer of his property. (See *Rogers* v. *Scott*, 28 Cal. App. 93, 99 [151 Pac. 379]; *Soberanes* v. *Soberanes*, 97 Cal. 140 [31 Pac. 910]; *Broaddus* v. *James*, 13 Cal. App. 464, 466 [110 Pac. 158].) [7] Nor does the fact that the grantor was afflicted with a serious physical malady at the time of executing the grant itself warrant the conclusion that he was mentally incompetent to transact the business culminating in the execution of the grant. As is true here, as against the positive uncontradicted testimony of witnesses who were acquainted with the grantor and who had ample opportunity to form an intelligent opinion as to his mental condition and capacity prior to, at the time of and subsequent to the transaction, and having no personal interest in the event of the issue, that, at the time he executed the grant, he was in a sound mental condition, fully capable of safeguarding his own interests or his property rights in any of the ordinary transactions with the general nature or character of which the average person is familiar, the mere fact that he was old when making the grant, even coupled with the fact that at such time he was afflicted with a serious physical malady, is entitled to no such weight as to justify the conclusion that the transaction was executed by him against his will or as the result of the exercise of undue influence by the grantee,

or without full understanding on his part of the nature and the effect thereof upon his rights.

[8] The matter of the consideration for a grant or the assignment of property is, in conceivable cases, of controlling importance, particularly where the consideration appears to be grossly inadequate. This declaration has peculiar application to suits in equity for the enforcement of executory agreements for the sale of real property. But in such cases, as in actions like the one before us, "the sufficiency of the purported or claimed consideration for a contract of the character under discussion (practically for the specific enforcement of an agreement to convey to plaintiff certain property) must be determined from the facts of the transaction as they existed when the contract was made, rather than by subsequent developments." (*Parsons* v. *Cashman*, 23 Cal. App. 298, 302 [137 Pac. 1109, 1111].) [9] Applying that rule to the facts of the instant case, it is clear that the consideration for the conveyances moving from defendants to Bentson cannot justly be declared to be so inadequate as to constitute it a sufficient ground for vitiating the conveyances, or, of itself, or when considered in connection with the facts of Bentson's advanced age and serious illness, to be regarded (in view of the uncontradicted evidence disclosing all the circumstances leading to and attending the consummation of the transactions) as of sufficient probative significance to justify the conclusion that the agreement and the instruments thereupon following were procured to be executed by the deceased through fraud or the exercise of undue influence, or that deceased, when signing the instruments, was mentally incompetent to transact the business intelligently and freely. F. D. Studley, as we have seen, was a carpenter by trade, capable of earning eight dollars per day when engaged in work at the trade, and at the time the transactions herein involved occurred had open to him employment at said trade. The doctor attending the deceased, while stating to said Studley that Bentson was suffering from an incurable disease—a disease which would cause his death— also in effect stated to him (F. D. Studley) that the nature of the disease was such that Bentson might live a few months only or he might linger for years. Under those circumstances, the Studleys could not know or determine how long they would be required to devote themselves to the care of

the deceased, and with this understanding of the situation they entered into the agreement in question, F. D. Studley forfeiting all opportunity for work at a trade at which he could earn lucrative compensation, and giving himself over entirely to caring for the deceased. Obviously, the extent of the responsibilities imposed upon or assumed by the defendants under the agreement could not be measured at the time the instrument was executed, and, as is said in *Parsons* v. *Cashman, supra,* so it is peculiarly true here, the fairness or reasonableness of the agreement must be determined by the facts and circumstances existing at the time the transaction was had and not by the fact that the death of the deceased, which might have been postponed for several years, according to the doctor, occurred within a few months after the agreement was made and the defendants began the performance of the services thereby required.

We think, as the foregoing discussion indicates, that the decision of the trial court is without evidentiary support. The judgment is reversed.

Plummer, J., and Finch, P. J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 28, 1927.