[Civ. No. 1850.  Third Appellate District.—March 7, 1919.]

# E. H. ROTH, Appellant, v. MARY C. THOMSON, as Executrix, etc., Respondent.

[1] BROKERS — COMMISSIONS ON SALE OF REAL ESTATE — PROCURING CAUSE—FINDING FOR DEFENDANT SUPPORTED BY EVIDENCE.—In this action by a real estate broker for commissions on the sale of a ranch, the evidence supported a finding that the sale was not made through any effort of the plaintiff.

[2] ID.—SALE BETWEEN PURCHASER AND VENDORS.—The mere listing of the property by the brokers and sending purchasers letters describing it among other properties for sale, without calling particular attention to it, did not make the brokers the procuring cause of the sale where the purchasers had been trying to buy the property for a period of eleven years without arriving at an agreement, and finally bought it directly from the owners after the latter had reduced the price slightly.

[3] ID.—RULE AS TO BROKER'S RIGHT TO COMMISSION.—To entitle a broker to commission for the sale of real estate, which he has been given by the owner authority to sell, he must produce before the owner a purchaser ready, willing, and able to purchase at the price and on the terms specifically expressed in the contract of employment.

[4] ID.—CHANGE BY OWNER IN TERMS OF SALE.—A change made by the owner in the terms of sale when consummating the sale cannot impair the right of the broker to his commission.

[5] ID.—BROKER AS PROCURING CAUSE.—In order to recover commissions, the broker must be the "procuring" cause and not one in a chain of causes of the sale.

[6] ID.—NO EXCLUSIVE CONTRACT.—Where a broker had written to the owner asking if his ranch was still for sale, and if there had been any change in the price, and the owner replied, setting a price and mentioning the commission he was willing to pay, the owner still had the right to sell independently of the broker, since there was no exclusive right to sell and no time fixed within which the sale might be made.

[7] ID.—EVIDENCE—HEARSAY.—In a broker's action for commission on sale of a ranch a statement by one of the owners that the broker had nothing to do with the sale was clearly hearsay and self-serving, and an objection to the testimony should have been sustained.

APPEAL from a judgment of the Superior Court of Mendocino County.  J. Q. White, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Charles Kasch and W. G. Poage for Appellant.

Preston & Preston for Respondent.

HART, J.—The action was brought to recover from one Henry T. Thomson a real estate broker's commission alleged to have been earned by plaintiff in procuring purchasers of certain lands of said Thomson. Subsequently to the filing of the complaint, Henry T. Thomson died, his wife, Mary C. Thomson, was duly appointed and qualified as executrix of his will, and plaintiff filed a supplemental complaint making her, as such executrix, the party defendant. The supplemental complaint set up the due presentation to the executrix and the rejection by her of a claim for $968 as commissions for plaintiff's alleged services and prayed judgment for that amount.

The cause was tried before the court sitting without a jury and judgment was rendered in favor of defendant. From said judgment plaintiff prosecutes the appeal.

It is agreed by both parties that there are two questions to be decided, namely: Was there a sufficient contract of employment and agreement to pay a commission, signed by Henry T. Thomson? If so, did plaintiff produce a purchaser ready, willing, and able to purchase the property from said Thomson under the terms and conditions of said contract of employment?

The court found that, on the twenty-sixth day of February, 1917, Henry T. Thomson was the owner of about 1,940 acres of land in Mendocino County and of a large amount of personal property, consisting of cattle, horses, and hogs; that, on or about said date, said Thomson, without the aid or assistance of plaintiff, found purchasers for said ranch and personal property in the persons of C. E. Firebaugh and J. W. Firebaugh; that C. E. Firebaugh entered into a contract with said Thomson, agreeing to purchase said property for twenty-three thousand five hundred dollars, payable as follows: One thousand dollars on the execution of said agreement; eight thousand dollars upon the execution and delivery of a good and sufficient warranty deed conveying the lands of said Thomson and a bill of sale for the personal property; the balance of fourteen thousand five hundred dollars to be

40 Cal. App.—14

represented by a promissory note payable on or before six years from date of delivery of deed, with six per cent interest per annum, secured by mortgage upon the property transferred; that said Firebaughs thereafter completed the purchase of said ranch from deceased; that plaintiff did not procure said purchasers for said property nor did he act as agent for deceased in the sale thereof; that he did not bring the parties together and did not induce the said Firebaughs to enter into said contract; that he rendered no valuable or other service to deceased in procuring said purchasers and is not entitled to any commission.

The contract of employment relied upon by plaintiff consists of a number of letters passing between him and Henry T. Thomson, plaintiff residing at Willits, and said Thomson at Covelo, in Mendocino County. The first letter, written by plaintiff, was dated August 19, 1915, in which it was stated: "I am writing to find out if your ranch is still in the market. . . . I had a gentleman in my office who wants a good stock ranch. . . . I told him about your ranch, and he promised to go up and see it within the next two weeks. His name is V. A. Spragia, so if he comes and you do business you will do the right thing by me. Would be pleased to hear from you as to any changes in price or otherwise." Thomson replied to this letter on the next day, August 20th, as follows: "My ranch is on the market for $26,000.00. 1840 acres of land and all of the stock. . . . Your commission will be 5% on the land. Will not pay any commission on sale of stock." On August 23d plaintiff wrote asking Thomson to segregate the land and the stock, giving the price on each. On August 25th Thomson wrote that the price of the land was ten dollars per acre and that the stock was not for sale if he did not get a buyer for the land. On April 17, 1916, Thomson again wrote plaintiff, giving an itemized list of his livestock, farming implements, etc., and the value of each, and stated: "I will take $26,000.00 for this property. Pay you 5 per cent com. on sale of land. $15,000.00, balance $11,000.00 at 6%."

We are satisfied that the finding that the sale of the Thomson ranch to the Firebaughs was not effected through any effort of the plaintiff derives sufficient support from the evidence, hence it will not be necessary to consider whether the plaintiff's purported authority to negotiate the sale of the

ranch measured up to the requirements of our statute of frauds, or, to be more definite, comes fairly within the provisions of section 1624, subdivision 6, of the Civil Code. (See, also, Code Civ. Proc., sec. 1973, subd. 6.)

The facts, as briefly as they may well be stated, are these: In 1906 J. W. Firebaugh met Mr. and Mrs. Thomson on the Thomson ranch and purchased from them a number of horses, and there were then some negotiations between the parties regarding the purchase of the ranch by Firebaugh. In 1911 the Firebaugh brothers again met the Thomsons' at their ranch, remained there three days and attempted to buy the property, but could not come to an agreement. The Firebaughs lived in Fallon, Nevada, and, after returning to their home, a number of letters passed between them and Thomson, none of which appears in the record, relative to the purchase of the ranch and stock. Mrs. Thomson testified that the correspondence with the Firebaugh brothers relative to the proposed purchase of the ranch thereafter continued, intermittently, for a period of two years and ceased either in the year 1913 or 1914. Asked if she at that time had given up selling the place to them, she replied: "Well, I should say so."

After the receipt of the letter from Thomson, dated August 25, 1915, heretofore referred to, plaintiff went to the Thomson ranch and secured five or six photographs of the place, in one of which Mrs. Thomson appeared. He placed an "ad" in one of the San Francisco daily papers, advertising different properties for sale. J. W. Firebaugh saw this ad and, on December 18, 1915, wrote plaintiff requesting him to send a list of properties he had for sale in Mendocino County, which plaintiff did. Firebaugh replied requesting detailed information as to certain properties, which plaintiff furnished him. On December 31, 1915, Firebaugh wrote plaintiff asking for further information and stated: "The place you speak of at Covelo answers the description of a place I looked at once. East of Round Valley on the road to the Sacramento Valley. Owned at that time by a Mr. Thomson." Plaintiff sent the photographs he had of the Thomson ranch to Firebaugh, who recognized the place and also Mrs. Thomson in one of the pictures.

In 1916 the Firebaughs again visited the Thomson ranch and, in February, 1917, they purchased the property. J. W.

Firebaugh testified that when going to the ranch at this time they did not stop to see plaintiff and said that he had never met him prior to the consummation of the sale. It does not, in fact, appear that the Firebaughs ever communicated with or heard from the plaintiff after January 20, 1916.

Testifying as to the circumstance of the appearance of the Firebaughs at the ranch in the summer of 1916, Mrs. Thomson said that they (the Firebaughs) were at that time "passing through the country" on a camping tour and stopped at a "ranger's station" where a Mr. John Bauer was stationed. The Firebaughs remained in that locality for seven days, during which time they renewed negotiations with the Thomsons for the purchase of the ranch. They rode over the ranch and examined it and the stock carefully, being accompanied on one occasion by Mr. Thomson himself and on others by some-one sent out by Thomson. She testified that they at that time almost came to an agreement for the sale of the ranch and stock to the Firebaughs, but the latter were not satisfied with the price asked for the properties. Without then consummating the purchase, the Firebaughs proceeded to Covelo and thence to Napa. The Thomsons had asked twenty-four thousand dollars for the ranch, the equipments and the stock thereon, and gave the Firebaughs ten days within which to decide whether they would take the properties at that sum. Later the Firebaughs addressed to the Thomsons a letter in which they offered them twenty-one thousand dollars for the properties. Mrs. Thomson said that, immediately on reading that letter, she destroyed it. The next time the Thomsons heard from the Firebaughs relative to the purchase of the ranch was in February, 1917, when the Mr. Bauer, above mentioned, having received a letter from the Firebaughs, requesting him to see the Thomsons and ascertain from them the lowest price they would take for the properties, went to the home of the Thomsons and read to them the letter. The Thomsons told Bauer that they still wanted and would require twenty-four thousand dollars for the ranch and stock, etc. A few days thereafter J. W. Firebaugh visited the Thomsons and said he desired to look over the stock on the ranch, to see how they had "wintered and count them up and see what we had." Mr. Thomson sent a man with said Firebaugh over the ranch to look over and take an account of the number of head of the different kinds of stock owned by the Thomsons

and then on the ranch. Again, on this occasion, the said Firebaugh was told by the Thomsons that they demanded and wanted twenty-four thonsand dollars for the ranch as it then stood and the stock. Firebaugh said he would give them an answer within a few days. On the seventeenth day of February, 1917, the said J. W. Firebaugh sent a telegram to Mr. Thomson, dated at Napa, in which he offered to give Thomson twenty-three thousand five hundred dollars for the properties, "providing the Forest Service will give us the same range now allowed you. If that suits you, meet me at Ukiah." (Here it may be explained that the Forest Service of the United States had rented a large tract of government range land adjacent to that of the Thomsons to the latter at a nominal rental.) After considering this proposition, the Thomsons concluded to accept it and thereupon telegraphed the Firebaughs to meet them at Ukiah on February 22, 1917. The Firebaughs and the Thomsons met at Ukiah on February 25, 1917, and then and there immediately entered into negotiations, which, as stated above, culminated in the sale of the properties to the Firebaughs.

It is not at all doubtful that, from the foregoing evidential facts, the trial court could justly have specifically found, as impliedly in general language it did find, that the Firebaughs, for a period of approximately eleven years, dating from the year 1906—long before the latter had ever had any communication with the plaintiff regarding the ranch—had been trying to purchase that particular property; that their minds were and had been for many years particularly fixed upon buying the Thomson ranch; that, after having attempted but failed a number of times to consummate a deal with the Thomsons, the advertisement of the plaintiff in one of the San Francisco newspapers, setting forth that he had for sale several different tracts of land in Mendocino County, came under their observation, and that, being desirous of securing good stock land in Mendocino County, they communicated with the plaintiff for the purpose of securing from him further particulars or more definite information than the advertisement disclosed of the properties he had for sale; that, upon receiving a reply to their letter from plaintiff, the Firebaughs found that the Thomson ranch, which they had for many years been endeavoring to buy, was among the properties which the former referred to in his advertisement;

that, without further communication or dealings with the plaintiff, the Firebaughs, about a year subsequently, again went to the Thomson ranch and again opened up negotiations with the Thomsons themselves for the purchase of the ranch, and finally made a deal with them and bought their ranch at a price several thousand dollars below that which they authorized the plaintiff to sell it for in the letter to him of August 19, 1915.

[1] It is to our minds perfectly clear that from such findings, which, as before stated, were impliedly made by the court in this case, the conclusion is irresistible that the plaintiff's efforts were not the procuring or efficient cause of the sale of the ranch to the Firebaughs. [2] It was not as the result of his efforts that the minds of the vendors and vendees were brought together upon the proposition. He did not even put the Firebaughs "on the track" of the property, for they themselves had for a long time previously to any communication with the plaintiff been "on the track" of the property, and for a corresponding period of time had perseveringly endeavored to purchase it at a price agreeable to their own conception or estimate of what it was worth. There is no evidence that the plaintiff ever informed the Thomsons that he had in the Firebaughs prospective buyers of their ranch, and Mrs. Thomson testified that, when the negotiations directly resulting in the sale were pending, they asked J. W. Firebaugh, who at that time was conducting the negotiations on behalf of himself and brother, whether there was any real estate agent or broker concerned in the transaction in any way, and he replied in the negative. In a word, the plaintiff did not produce the Firebaughs before the Thomsons as a purchaser ready, able, and willing to buy the ranch upon the terms and at the price fixed by the Thomsons in their letter to the plaintiff purporting to authorize him to sell the property. As far as the evidence shows the plaintiff had gone in an effort to sell the property to the Firebaughs was in writing the latter letters describing among other properties he had for sale in Mendocino County the ranch of the Thomsons. He, indeed, did not direct the attention of the Firebaughs particularly to said ranch until after the latter had, in a letter addressed to him, inquired whether the tract referred to in a letter to the Firebaughs from him as "stock ranch 1840A" was the Thomson ranch. In reply to that in-

quiry he gave the Firebaughs in a letter some particulars as to the character of said ranch; but he thereafter did absolutely nothing to bring about the sale. This sale, as seen, was effected only after considerable negotiations between the Firebaughs and Thomson and after the latter had reduced the price in a small amount.

[3] The rule is that to entitle a broker to a commission for the sale of real estate which he has been given by the owner authority to sell, he must produce before the owner a purchaser ready, willing, and able to purchase at the price and on the terms specifically expressed in the contract of employment. [4] While a change made by the owner, when consummating the sale, in the price of the land or the terms of the sale from those specified in the broker's contract cannot of itself affect or impair in any way the right of the broker to his commission, the latter cannot claim a commission unless his efforts are the procuring or inducing cause of the sale. This proposition is explained with singular lucidity in *Smith* v. *Preiss,* 117 Minn. 392, [Ann. Cas. 1913D, 820, 136 N. W. 7], as follows: [5] "In order for the broker to recover, the evidence must show that his efforts were the procuring cause and not merely one in a chain of causes. The expression 'procuring and inducing cause,' as used in the books, refers to the cause originating from a series of events that without break in their continuity results in the prime object of the employment of the agent."

The books are full of cases expounding and applying the rules governing in cases of this character, and it is sufficient merely to cite a few which are particularly applicable to the facts of the case now in hand, viz.: *Zeimer* v. *Antisell,* 75 Cal. 509, [17 Pac. 642]; *Gunn* v. *Bank of California,* 99 Cal. 349, [33 Pac. 1105]; *Cone* v. *Keil,* 18 Cal. App. 675, [124 Pac. 548]; *Dreyfus* v. *Richardson,* 20 Cal. App. 800, [130 Pac. 161]; *Brown* v. *Mason,* 155 Cal. 155, 159, [90 Pac. 867].

[6] Of course, it will not be contended that the Thomsons did not have the right to sell the property independently of any arrangements or agreement they had with the plaintiff. The brokerage agreement in this case, assuming that it is legally sufficient as such in all respects, cannot be construed as vesting in the plaintiff the exclusive right to sell the property. Indeed, it does not even go so far as to make him the exclusive agent for that purpose, nor does it specify any time

during which his authority to sell should exist. Conceding it to be sufficient to have authorized him to sell the property, it is so phrased that the Thomsons were at liberty to terminate it at any time before he procured a purchaser able, willing and ready to purchase on the terms stated therein. But, however this may be, it is clear, as stated, that the Thomsons had the right to sell the ranch without the assistance or intervention of the plaintff and that the finding that they did so is, as above declared, well supported.

[7] The only other point urged for a reversal involves certain rulings whereby certain witnesses were permitted, over objection by the plaintiff, to testify that, in conversations with Henry T. Thomson, just prior to his death and shortly after the sale was effected and after the plaintiff had started this action, the said Thomson declared that the plaintiff had had nothing to do with the sale of the ranch. It is claimed that this testimony was highly prejudicial to the substantial rights of the plaintiff.

The testimony is clearly hearsay and self-serving, and the objection to it should have been sustained. We are not prepared, though, to say that it resulted or could, under the circumstances of the case, have resulted in substantial or, indeed, any damage to the plaintiff's rights in the trial of the case. The cause was tried by the court, and it is to be assumed that the court, in reaching its conclusion, disregarded any incompetent testimony which might have found its way into the record. But, beyond this consideration, there is, as has been shown, other testimony in the record which of itself is amply sufficient to support the decision. Indeed (we do not hesitate to say) the objectionable evidence referred to may be and could have been by the trial court utterly disregarded and still, the verity of the other evidence having been established by its acceptance by the trial court, no other decision than that crystallized in the findings, so far as is concerned the issue as to whether it was directly or otherwise through plaintiff's efforts that the ranch was sold to the Firebaughs, could justly have been warranted. We, therefore, conclude that the error complained of cannot be held to have resulted in a miscarriage of justice. (Const., art. VI, sec. 4½.)

The judgment is affirmed.

Buck, P. J., *pro tem.*, and Burnett, J., concurred.