[Civ. No. 14103.   First Dist., Div. Two.   Mar. 2, 1950.]

MARGARET GOETTING PFINGST, as Administratrix, etc., Appellant, v. GASTON I. GOETTING et al., Respondents.

Hilary H. Crawford for Appellant.

Dreher, McCarthy & Erickson for Respondents.

GOODELL, J.—This action was brought to recover for the estate of Annie Hinds upwards of $81,000 which had been transferred by her into joint accounts in the names of herself and her nephew, respondent Gaston I. Goetting, several years before her death. The suit was based on the claim that she was incompetent and acting under his undue influence at the time of the transfers. The findings negatived these charges, and judgment went in favor of defendants. After the denial of a new trial this appeal was taken.

Annie Hinds, who was unmarried and a retired teacher, died on October 20, 1945. She left a sister named Florence Morgan, who did not appear in the case as a witness or otherwise. Other next of kin were Margaret Goetting Pfingst (appellant) and her brother Gaston I. Goetting (respondent) who were children of a deceased sister of decedent named

Frances Goetting; others were Lucille Clayton and Joseph Mitchell, children of a deceased niece of decedent, and Lila Doyle and Charles Goetting, children of a deceased nephew.

The transfers were made in February, 1942, at which time decedent was 82 years old and confined to her home because of serious illness. For some years she had lived with her sister and brother-in-law, Mary and William J. Young, in a flat on Second Avenue in San Francisco. Each month decedent received from the school department a pension check for $117.18 and as these checks came in Mrs. Young would take them to the Hibernia Bank and deposit them in a joint account in the names of Annie Hinds or Mary Young. A power of attorney had been made by Annie to Mary to enable her to attend to this business. In January, 1942, however, Mary Young became so ill that she, too, was confined to the house, and decedent told her nephew that she desired to give him her power of attorney to attend to her checks, and desired also to change all her five bank accounts into joint accounts in her name and his. Such power of attorney was executed and such transfers made under circumstances presently to be stated.

The five accounts were as follows: (a) in Crocker First National Bank, $18,101.67; (b) in Bank of America, $15,-096.92; (c) in American Trust Company, $21,247.22; (d) in The Hibernia Bank, $23,590.58, and (e) in The San Francisco Bank, $3,654.93. They aggregated $81,691.32 and constituted practically all of decedent's property.

Within a few days after February 15, 1942, the Crocker, Bank of America, American Trust Company and Hibernia accounts were transferred into joint accounts in the same banks in the names *Annie Hinds or Gaston I. Goetting* and The San Francisco Bank account was transferred into the names *Annie Hinds or Gaston I. Goetting, trustee.* These five transfers are the principal basis for this litigation.

Mrs. Young steadily declined in health, and passed away in July, 1942. Meanwhile, because of the war, black-outs, and apprehension over the possibility of aid raids, Miss Hinds' illness was aggravated by nervousness and she expressed to her nephew her discomfort and worry over living in a frame dwelling. Respondents who lived in an apartment building looked for larger quarters and finally found an eight-room apartment in the same building which would accommodate themselves, the decedent and her nurse, and Mr. Young, and

in August, 1942, moved decedent there, where she continued to live with the Goettings until her death in October, 1945. The brother-in-law also moved there.

It appears that in these new surroundings decedent was comfortable, with the freedom of the entire apartment, the opportunity to have her friends visit her, and with a practical nurse to take care of her.

As time went on the nephew withdrew from the several accounts sums of money which he invested in government bonds and other corporate securities which were put into the names of both respondents. He testified that whenever such withdrawals and investments were made it was only after full discussion with his aunt, and her approval.

There was no evidence whatever of any importunity or pressure such as would constitute actual undue influence. Although it was alleged that the power of attorney was obtained for the purpose of gaining control of decedent's bank accounts there was no such proof; the record shows that the power of attorney, although general in form, was never used except for the endorsement and deposit of the pension checks.

The court found that at all times mentioned in the complaint and until the date of decedent's death a relationship of mutual trust and confidence existed between her and Gaston I. Goetting; that at no time did he control or influence her mind or actions and that at all such times until approximately one week prior to her death she was mentally competent to manage her business and affairs; that the creation by her of the joint bank accounts and the withdrawals therefrom of funds used to purchase securities in the joint names of the respondents, and the gift by decedent to her nephew of $3,000 were her free and voluntary acts; that at and before the times of said acts she knew and understood the nature and effects thereof and that none of said acts was influenced or controlled by the mind or conduct of the defendants or either of them.

The sufficiency of the evidence to sustain these findings is not challenged. Counsel for appellant candidly says: ''As might be expected, there was a sharp conflict in the testimony. The appellant claimed that the aunt was incompetent and produced evidence to that effect. The respondents claimed that she was competent, and they introduced evidence in support of that contention. The case was a close one and the decision could have gone either way. It is our claim that because of the sharp conflict in the evidence any error in the

admission of evidence should be scrutinized carefully by this Court. In view of the fact that there was this conflict in the evidence, we are not in position to say that there was not some testimony to support the decision of the Court that the decedent was competent.''

The foregoing statement of counsel has reference to the testimony of three bankers respecting decedent's actions and conversations at the time of the transfers, which is the basis of appellant's first point on appeal. Her second point is that decedent had no independent advice.

At the outset it must be conceded that there was ample evidence, including that of respondent Gaston I. Goetting, to support the finding that a relationship of mutual trust and confidence existed between decedent and her nephew. And in view of all the circumstances it must also be conceded that the nephew occupied what the authorities call the superior position. That being so, a presumption of undue influence arose, as contended by appellant and as held by numerous authorities (which need not be cited). The burden, then, was cast on the nephew to dispel and overcome that presumption by showing ''that the gift was freely and voluntarily made, and with a full knowledge of all the facts, and with a complete understanding of the effect of the transfer'' (*Brown* v. *Canadian etc. Co.*, 209 Cal. 596, 598 [289 P. 613] and cases cited.) Such burden, of course, could not have been sustained unless the evidence convinced the court that decedent was competent at the time of the transfers.

When, according to the nephew's testimony, decedent had proposed these transfers, he consulted his attorney who advised him that she could make them provided she was competent. Accordingly, the nephew requested Dr. John A. Haderle, who was decedent's family doctor, and had been for over 20 years, to examine his aunt ''for the purpose of determining her mental composure [competency?] or the lack of it.'' Such examination was made on February 16, 1942, and Dr. Haderle testified at considerable length respecting it. He said: ''I thought she was perfectly mentally competent to conduct her own business, excepting she was physically unable.'' He saw decedent about once a week in January and February, 1942, and continued as her physician until her death, the causes of which were ''cerebral apoplexy, general sclerosis and myocarditis, chronic.'' In his judgment she remained competent until her death except probably the

last week when she was in a comatose condition. "Prior to that time, she seemed to be quite rational."

On cross-examination he testified that she was confined to her bed a great part of the time; for many months she could not leave the house; she had a paralysis from anemia and also a very marked arthritis. She was not "necessarily" in bed for the last six or eight months, but was sitting up most of the time; she was confined to bed sometimes, when some acute illness came on, such as intestinal illness. About January, 1945, she had such serious illness or toward the end of the year (meaning, no doubt, 1944). When asked whether she was senile he answered "I think pretty nearly everybody after 75 or 76 gets senile." He testified, however, that she was never confused during his visits. On redirect he testified that her health improved very much after she went into the Goetting home. On the occasions of his visits, he was permitted to be alone with the patient; usually there would be a nurse there, but frequently decedent would be alone with him while the nurse would step out of the room. There was never any restriction on his movements while in the Goetting home. On cross-examination he testified: "Q. Did you ever see her walk unassisted? A. No, I can't say I did. Q. Could she feed herself? A. She tried to, but not very well, on account of this condition about the hands. Q. Never even combed her hair, did she? A. I didn't see her. Q. Never bathed herself? A. No, I don't think so. Q. She was just practically helpless, as a matter of fact, was she not? A. Pretty much so."

Dr. Haderle had never been the doctor for either of the respondents, but had been the Hinds' family doctor including Mrs. Young and Annie. There was no objection to any of his testimony.

Seven witnesses on appellant's side testified that decedent was incompetent. None of them was asked by either counsel to give her idea of competency, and its meaning was not defined or explained to them. They were simply asked whether decedent was competent or not, and answered in the negative.

The witnesses who so testified were Mrs. Margaret Goetting Pfingst, a niece, Mrs. Margaret Glensor Cumming, a grandniece of decedent and the daughter of plaintiff, Mrs. Lucille E. Clayton, a grandniece, Mrs. Lila Doyle, a grandniece, Mrs. Lila Goetting, widow of Charles Goetting who was a deceased nephew of decedent, and two practical nurses, Mrs. Mary Armstrong and Mrs. Margaret West. Each of them stated

their opportunities for observation and the frequency and duration of their visits or contacts with decedent. Each of them laid considerable emphasis on the serious physical condition of decedent, but it is not necessary to detail that testimony since none of them gave decedent a poorer bill of health than that given by decedent's own doctor, who was respondents' witness. His testimony, already related, concluded with the question "She was just practically helpless, as a matter of fact, was she not?" and his frank answer "Pretty much so."

One of the nurses, Mrs. West, who testified decedent was incompetent, did not attend decedent, or know her, except for a period of service from December, 1943, until June, 1944, which was over a year and a half after the transfers, and again from December, 1944, until decedent's death in October, 1945, which was even more remote.

Before leaving this subject it should be noted that although the plaintiff testified that her aunt was incompetent—based on a visit with her in January, 1942,—she admitted on cross-examination that "on some subjects, she would be very clear, particularly about money matters. She would get terribly confused over minor matters . . . On some points, she was very clear . . . Money matters, at the time she took to her bed, became almost a mania with her, she brought the subject up constantly with all of us, never seemed to deviate from the first thought. When we thought her mind was getting senile on many other things, her mind always remained the same on the disposition of her finances."

Plaintiff's daughter gave somewhat similar testimony on her cross-examination. She said referring to money, "She turned towards us and was a little bit surer when she was talking about it. The rest of the time, she was wandering again. Q. Was she agitated at all when your mother was discussing the financial affairs? A. I wouldn't say agitated. She was just a little bit more alert."

██ There can be no doubt that Annie Hinds, at the time of the transfers was a very sick woman and quite helpless. However, serious illness is not a determining factor. In the case of *Carty* v. *Connolly*, 91 Cal. 15, 20-21 [27 P. 599] the court said: ". . . we know of no reason . . . why a person of perfect mental capacity, acting freely and voluntarily, who is sick with mortal illness, is not entirely competent to make a voluntary conveyance of his property as fully and completely as when experiencing the enjoyments of perfect

health, . . . It is not a question of physical condition, of pain or absence of pain, of long life or short life, but it is a question of mental capacity and the free and untrammeled action of the mind." Followed in *In re Wilson,* 117 Cal. 262, 277 [49 P. 172, 711] ; *Becker* v. *Schwerdtle,* 6 Cal.App. 462, 466 [92 P. 398], and *Anderson* v. *Nelson,* 83 Cal.App. 1, 5 [256 P. 294]. See, also, *Nessen* v. *Nessen,* 218 Cal. 59, 61 [21 P.2d 415]. Nor is advanced age a determining factor. Standing alone it is not sufficient to raise a presumption of undue influence (*Soberanes* v. *Soberanes,* 97 Cal. 140, 146 [31 P. 910, 17 L.R.A. 301], followed in *Best* v. *Paul,* 101 Cal.App. 497, 499 [281 P. 1089] ; see, also, *In re Wilson, supra,* p. 277, and *Johnson* v. *Studley,* 80 Cal.App. 538, 559 [252 P. 638].)

It is true, of course, that if age or ill health impairs one's mental faculties another situation is presented. The doctor's testimony was that decedent "was perfectly mentally competent" despite her many bodily ailments and her helplessness. In weighing his testimony and that of the respondents who testified that she was competent, against that of the witnesses on the other side of the case, we assume the court considered the opportunity which the several witnesses had for observation and their own ages and experience, or, in other words, their own qualifications and competency for judging.

Respondents produced three witnesses with no interest whatever in the outcome of this litigation. It is out of their testimony that appellant's first point on appeal arises, namely, *"That it was error to permit witnesses who were not intimate acquaintances of Annie Hinds to express their opinions that she was competent."*

"It is our claim," says appellant, "that because of the sharp conflict in the evidence any error in the admission of evidence should be scrutinized carefully by this court . . . We . . . claim . . . that the Court was swayed by incompetent evidence which should have been excluded."

Within a day or two after February 15, 1942, The San Francisco Bank, the American Trust Company and The Hibernia Bank each sent a representative to decedent's home to interview her respecting the proposed transfer of these three bank's deposits, from her name to the names of herself and her nephew in joint account. Neither the Crocker Bank nor the Bank of America sent any representative. The three representatives who went out were experienced bankers, having been with their institutions for at least 35, 23, and 44 years, respectively. All

had gone many times before on similar missions to homes and hospitals where elderly or infirm depositors were confined.

None of them knew decedent well enough to qualify as an intimate acquaintance, and none of them knew the nephew before this visit.

The nature of the case, and appellant's suggestion that the claimed errors be carefully scrutinized, call for a rather detailed recital of their testimony. Moreover, it is important as well on the question of independent advice, later discussed.

John F. Muller, assistant cashier of The San Francisco Bank, testified that at decedent's request he visited her for the purpose of establishing a joint tenancy account with her nephew; that he "explained to her the consequences of establishing a joint tenancy account with right of survivorship, also that he would have the right to make withdrawals from the account at any time, as he so desired, and that upon her death, it would go to him." When asked whether she indicated what she wanted done he replied: "I asked her that, I asked her if she understood it thoroughly and she said she did, and I made a notation to that effect on the transfer order at that time in her presence." He testified that he thought the nephew was not present, but that decedent's brother-in-law was, and signed as a witness; decedent signed the signature card and withdrawal slip in the presence of the witness.

"Q. In your judgment, at that time could she understand what was explained to her? A. Perfectly. Mr. Crawford: I object on the ground it is not shown that the gentleman is an intimate acquaintance of hers. The Court: That would not make any difference, he could have an opinion as to whether she understood what he had to explain to her, and acquiesced in it."

He testified that his duties included visiting elderly and sick depositors to ascertain their intentions and to report to the bank whether or not they were, in his judgment, competent to perform the act that they requested done; "it was left to me," he said, "to decide whether the party was rational and fully understood the consequences of what they were doing." "Q. In your judgment, on the day that you discussed the joint tenancy account with Annie Hinds, was she competent to conduct her property and business affairs? Mr. Crawford: . . . I object on the ground it is not shown that the gentleman is an expert or intimate acquaintance, he has not shown how many times he ever saw her. The Court:

If he only saw her once, he can form an opinion . . . over-ruled. A. I was sure she was fully aware of the fact of what she was doing.''

His interview lasted from 15 to 20 minutes; it was just a "routine job.'' He identified both signatures on the signature card reading ''Annie Hinds or Gaston I. Goetting, Trustee'' and testified that the latter signed it ''Trustee.'' When asked ''You didn't give her any advice about what to do, you just asked her?'' he answered ''No, I just asked her what she wanted to do.''

William H. Phipps, manager of the savings department of American Trust Company's Savings Union office, testified that in February, 1942, he was assistant manager, and his duties included interviewing depositors unable to visit the bank, to ascertain their intentions with reference to requested action on their part affecting their accounts. He was assigned by the bank to interview decedent, and discussed with her the transfer of her account from her name to a joint account with her nephew. When he talked with her there were present her nephew, her brother-in-law and a nurse named Mary Armstrong, but the nephew took no part in the conversation. Its substance was: ''Mr. Goetting introduced me and explained I was the gentleman from the bank to confirm this request and to get her acknowledgment and complete the transfer action, changing her individual account to a joint tenancy''; that he explained to her what the effect of the transfer would be and she stated her intention as to what she wanted done; that she acknowledged her signature ''and further confirmed it, she acknowledged the first written request before the witnesses, Mr. Young and Mary Armstrong, and I further confirmed that by originating an entirely new request and transfer order.'' He prepared a new withdrawal slip for her signature and she signed it in his presence. ''Q. Mr. Phipps, in the course of your conversation with Annie Hinds, could she understand what you said to her? A. Clearly, yes. Q. She expressed herself clearly to you, too, did she? A. Clearly and completely. Q. And in your opinion or your judgment at that time, Mr. Phipps, was she competent to manage and conduct her property and business affairs? A. Yes. Mr. Crawford: . . . I object on the ground the witness is not qualified as a mental expert, and it is not shown he is an intimate acquaintance. The Court: Well, I will let him testify as to whether she could understand the transaction in which she was involved at that time. A. Yes.

Mr. McCarthy: The question was whether she was competent. The Court: I asked another question . . .''

The examination continued: ''Q. Well, really, all you went out to do was just take a look at the lady, wasn't it, and see if that was her signature? A. Satisfy myself as to her capacity and responsibility, the same as the other gentlemen, I listened, to the testimony preceding, the gentlemen of the banks. It is more or less routine. Q. It was just a kind of routine visit? A. Yes. Q. You didn't give the lady any advice about what she should do, did you? A. No, I gave her an explanation of the joint tenancy and the features of the transaction. Q. But you didn't advise her either to do it or not to do it, did you? A. No, sir.''

Hugh F. Mullin, manager of the Geary-Tenth Avenue office of the Hibernia Bank, testified that in February, 1942, his duties included the interviewing of depositors who were unable to visit the bank, to ascertain their intention with reference to accounts including the matter of determining for the bank's purposes the competence of the individuals to procure the accounts that they requested, and that his visit was at the request of his bank. He said that although there were two or three other persons there, and he was not certain who they were, he talked with decedent alone. ''Q. Will you tell the court what the substance of your conversation with Annie Hinds was? A. Well, my main object in visiting her was to find out just what she wanted, and that she was———'' Appellant called for the conversation, the court so ruled, and he answered: ''She told me that she had this account and wished it transferred and placed in her name with that of her nephew, and I ascertained that she was clearly competent to know what she was doing, and complied with her request. Q. Did you explain to her the effect of the creation of the joint account? A. Oh, yes, thoroughly. Q. Did you tell her what the other joint tenant could or could not do? A. Absolutely. Q. Did she understand that at that time? A. She understood it thoroughly. Q. Did she state what her wishes were with reference to the opening of the new account? A. No. Q. I mean, did she tell you that she wanted the account transferred to a joint account?. A. Oh, there was no question on that, yes. Q. In your judgment, at that time was she competent to act? A. She was.''

On cross-examination he was asked: ''Q. Did you give her any advice at all? A. None at all. Q. Did she ask any advice

from you? A. No, she seemed to be prepared to do a certain thing, and she knew what she was doing.''

Appellant's objections to two of the questions asked the witness Muller and to the question asked the witness Phipps were that they were neither experts nor intimate acquaintances. Section 1870, Code of Civil Procedure, provides that evidence may be given of the following facts: (subd. 10) ''. . . the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given; .'' Mental sanity was not involved; the inquiry was with respect to competency, an altogether different question. (See discussion and cases cited in *In re Jackson* (*In re Zanetti*), 34 Cal.2d 136, 141-143 [208 P.2d 657].)

Appellant's counsel states that ''Such witnesses could not, by any stretch of the imagination, have been her intimate acquaintances.'' That may be conceded, but apparently their testimony was neither offered nor admitted on that theory. Respondents were certainly entitled to show, if they could, that decedent when she made these transfers appeared to be rational and to act on her own volition, as a free agent and without pressure, to know what she was doing, and to comprehend the legal effects and consequences of her acts.

A long line of authorities sanctions the admissibility of such testimony without any regard to the intimate acquaintance rule.

In *People* v. *Lavelle*, 71 Cal. 351 [12 P. 226], one of the earliest cases on the subject, a witness testified that the defendant appeared rational at a given time. The court said: ''The evidence sought to be elicited was not the opinion of the witness as to the mental sanity of the defendant, based on an acquaintance with him, but was rather as to a fact, namely, his appearance at the time. The appearance of a person at a given time is one thing; the opinion of a witness as to the mental condition of that person, based on an acquaintance with him, is quite another.''

Among the many authorities there are four cases which are somewhat similar to this case because they involve—as this case does—testimony as to the conversation, actions, alertness and conduct of a person at a given time and *during a particular transaction.*

First: *In re Wax*, 106 Cal. 343, 349, 350 [39 P. 624]. There the testator's soundness of mind was in question. A merchant who ''had a slight acquaintance with him'' testified that Wax had sought a loan of $1,200 from him; that they had conferred

respecting security, and the loan had been made and repaid: that he had "closely observed Wax when the loan was being negotiated." He was asked "How did he conduct the transaction of borrowing the money, paying the interest, etc.?" and over objection answered "He acted like any rational man would—like anybody else would." The court said: "The question did not call for an opinion of the witness, but for a statement as to the conduct and appearance of Wax at the time he made the loan and paid it. The question was relevant and material, and was proper under the law as declared in *People* v. *Lavelle,* 71 Cal. 351 [12 P. 226], and in *Holland* v. *Zollner,* 102 Cal. 633 [36 P. 930, 37 P. 231]."

Second: *De Arellanes* v. *Arellanes,* 151 Cal. 443, 450 [90 P. 1059], where a witness who had drawn and witnessed a deed testified over objection that he then found plaintiff in a perfectly rational condition and that her mind was clear. The court said: "This answer was substantially simply that she then appeared to be rational, a matter as to which any witness to a transaction is competent to testify. (*People* v. *Manoogian,* 141 Cal. 592, 595 [75 P. 177].)"

Third: *Carleton* v. *Bonham,* 60 Cal.App. 725, 730 [214 P. 503], which is particularly pertinent since it, too, involved the testimony of a bank employee respecting the alertness of a depositor. There a Mrs. Hildreth had a joint account with a Mrs. Bonham. A bank clerk with whom Mrs. Hildreth generally dealt, when asked ". . . whether in all her business transactions at the bank she appeared to be keen mentally and a business woman?" replied, over objection, "She did." The court held that the objection had been properly overruled, saying "the question merely called for appearances—not for a state of facts." (Citing *inter alia* the Holland, Wax and Manoogian cases.)

Fourth: *Jorgensen* v. *Dahlstrom,* 53 Cal.App.2d 322, 337 [127 P.2d 551], a case like the preceding one, where the assistant manager of a bank where the donor had kept her accounts for many years testified that "In all the transactions we had with her, why, we considered her a woman of very alert mind and positive in her manner. . . I would consider that Mrs. Jorgensen was a very alert business woman." The court said: "Such characteristics and traits may be testified to by a non-expert witness, without first qualifying as an intimate acquaintance . . . (*People* v. *Lavelle,* 71 Cal. 351 [12 P. 226]; *People* v. *Manoogian,* 141 Cal. 592 [75 P. 177].)"

Appellant attempts to distinguish the De Arellanes, Carleton and Jorgensen cases on the ground that they were not decided under the rule under discussion. Their language and the cases they cite show that they were.

It should be noted that in the Wax, Carleton and Jorgensen cases the questions were directed to observations made on occasions other than that on trial. Here, as in the De Arellanes case, the questions were focused on the very transaction under investigation, which presents a much stronger picture.

In the leading case of *People* v. *Manoogian, supra,* 141 Cal. 592, 597-8, the court said ". . . questions like those under consideration do not call for the opinion of the witness as to the sanity of the person concerning whom the inquiry is being made. Such an opinion can properly be given only by an intimate acquaintance or an expert. They simply call for the result of the observation of the witness as to the manner or conduct of such person *at a certain time* . . ." (Emphasis added.) That was a murder case and the rule seems to be applied as freely in criminal as in civil cases (see citations in *People* v. *Sprague,* 52 Cal.App. 363, 365 [198 P. 820]).

Many of the civil cases on the subject are cited at 10 California Jurisprudence, pages 1001-2.

The questions to which appellant objected were the following: the witness Muller was asked "In your judgment, at that time could she understand what was explained to her?" and answered "Perfectly." Appellant objected that he was not an intimate acquaintance. The court ruled "That would not make any difference, he could have an opinion as to whether she understood what he had to explain to her, and acquiesced in it."

There is no substantial difference between this question and those in the cases cited, or between this and the question in *People* v. *Loomis,* 170 Cal. 347, 349 [149 P. 581], a death penalty case, where the question asked was whether the defendant answered questions quickly and promptly. "There was no error in this" said the court there, "Such facts may be stated . . . by any witness who has observed them. They are mere matters of observation and not of expert knowledge." (Citing the Lavelle, Holland. Wax and Manoogian cases.)

The same witness (Muller) was asked: "Q. In your judgment, on the day that you discussed the joint tenancy account with Annie Hinds, was she competent to conduct her property and business affairs?" Appellant objected that the witness was neither an expert nor an intimate acquaintance and that "he has not shown how many times he ever saw

her." It must be admitted that this question was possibly too broad, as it called for an opinion on competency, not appearances. But, as it turned out, no damage could have resulted. The ruling was that "If he only saw her once, he can form an opinion" which incidentally, could not have been based on the intimate acquaintance rule. The answer was "I was sure she was fully aware of the fact of what she was doing." By its very unresponsiveness it removed all possibility of error since it left unanswered the broader question of competency, and apparently did so designedly. Respecting unresponsive answers see *Hirshfeld* v. *Dana,* 193 Cal. 142, 148 [223 P. 451].

The witness Phipps was asked "And in your opinion or your judgment at that time . . . was she competent to manage and conduct her property and business affairs?" Appellant objected that he was neither a mental expert nor an intimate acquaintance. The court in this instance took the matter in hand and narrowed the question by ruling "I will let him testify as to whether she could understand the transaction in which she was involved at that time." The answer was "Yes." Respondents' counsel then sought to press the original question by reminding the court that "The question was whether she was competent" but the court stopped that by saying: "I asked another question" which ended the discussion. The court's action in reframing the original question was a virtual sustaining of appellant's objection.

The witness Mullin was asked "In your judgment, at that time was she competent to act" and answered "She was." Appellant did not object in this instance. It is too late to urge on appeal an objection not made at the trial (2 Cal.Jur. 805; *Fintel* v. *Engelbrecht,* 28 Cal.App.2d 23, 25 [81 P.2d 1044]). If admitted without objection incompetent evidence may be accepted in proof of the issues of a cause. (*Nelson* v. *Fernando Nelson & Sons,* 5 Cal.2d 511, 518 [55 P.2d 859]) but it may be assumed that the court disregarded it (*Roth* v. *Thomson,* 40 Cal.App. 208, 216 [180 P. 656]; *Watt* v. *Copeland,* 92 Cal.App. 161, 170 [267 P. 928]; *Cordi* v. *Garcia,* 56 Cal.App.2d 584, 589 [132 P.2d 887]).

Frank .J. McCarthy, one of respondents' counsel, also testified as to decedent's conduct and appearance. He had gone out to see Miss Hinds, accompanied by her nephew, soon after she had proposed the transfers, and had explained to her the meaning, operation, effect and consequences of a joint account. There is no pretense that he was an intimate ac-

quaintance since he had never met her before. The nephew left the room while the attorney talked to decedent. The witness detailed what he said to her and she to him, the effect of which was that she knew about joint accounts and knew what she wanted to do. He was then asked: "Q. At the time you had this conversation with Annie Hinds, did you form any opinion as to her competency to transact this particular business? A. I did. Q. What was your opinion? A. In my judgment, she understood what I said to her, the explanation I gave her, and she gave me a clear and explicit expression of her intention and desire."

It will be noted that the witness did not answer categorically respecting competency. His answer was in guarded language and speaks for itself, and under the authorities heretofore cited it was perfectly admissible.

The testimony of the three bankers and the attorney has been discussed in its relation to the issue of decedent's competency. Respondents had the burden, also, of rebutting the presumption of undue influence arising out of the nephew's fiduciary status by satisfying the court that the transfers were made voluntarily, free from pressure, with knowledge of the facts and the effects and consequences. The answers which all four witnesses gave tended to show such knowledge, understanding and comprehension on decedent's part at the time of the transfers by showing that she was rational and lucid and had a grasp of the transaction. These four witnesses gave their observations of decedent *as of the time* of the transfers while other witnesses testified as to decedent's condition at times more remote from the transaction. The evidence just reviewed was admissible on the issue of undue influence as well as competency.

█ Appellants' second point is that *"The decision of the court was erroneous for the reason that the decedent had no independent advice in any of the transactions involved in this case."*

On this point appellant cites *Khoury* v. *Barham*, 85 Cal. App.2d 202 [192 P.2d 823] and *Hilton* v. *Hilton*, 54 Cal.App. 142 [201 P. 337]. *Khoury* v. *Barham* follows the early case of *Ross* v. *Conway*, 92 Cal. 632, 636 [28 P. 785], which holds "that the transaction will not be upheld, unless it shall be shown that such other had independent advice . . ." However, *Brown* v. *Canadian etc. Co.*, 209 Cal. 596, 599, *supra*, lists *Ross* v. *Conway* among the early cases which do not state the correct rule, while *Smith* v. *Lombard*, 201 Cal. 518, 524

[258 P. 55], shows that *Hilton* v. *Hilton, supra,* likewise fails to do so.

It is now definitely settled that independent advice is not indispensable. In *Brown* v. *Canadian, etc. Co., supra,* at page 599, the court says: "In some early cases of this court, where the factual situation was particularly aggravating, expressions may be found, when considered separately and without reference to the text, which imply that independent advice is essential to the validity of such a gift. (*Ross* v. *Conway, supra; Dolliver* v. *Dolliver,* 94 Cal. 647 [30 P. 4]; *Yordi* v. *Yordi,* 6 Cal.App. 20 [91 P. 348]; *Nobles* v. *Hutton, supra* [7 Cal.App. 20 (93 P. 289)].) But those cases were never intended to hold that independent advice was indispensable. We are in accord with the rule that where a fiduciary relationship exists between the donor and donee, the absence of independent advice is a circumstance to be considered in determining whether the gift should be avoided because of alleged undue influence or fraud, but its nonexistence alone does not authorize the court to avoid the gift. All utterances to the contrary have been squarely repudiated by this court. A fairly recent case so holding is *Smith* v. *Lombard,* 201 Cal. 518 [258 P. 55]. See, also, *Wilbur* v. *Wilbur, supra* [197 Cal. 1 (239 P. 332)]; *Soberanes* v. *Soberanes, supra* [97 Cal. 140 (31 P. 910)]."

Later cases to the same effect are cited in *Helbing* v. *Helbing,* 89 Cal.App.2d 224, 229 [200 P.2d 560].

While independent advice is not indispensable, the question whether there was such advice in any given case is "one of the facts to be weighed in determining whether the trustee performed his full duty" (*Stevens* v. *Hutton,* 71 Cal.App.2d 676, 683 [163 P.2d 479] and cases cited; see, also, *Broaddus* v. *James,* 13 Cal.App. 464, 475-6 [110 P. 158]). Likewise important is the question whether an *opportunity* for such advice was afforded (*Estate of Cover,* 188 Cal. 133, 144 [204 P. 583]). The court found that the decedent had independent advice, and the present inquiry is whether that finding is supported.

■ The testimony of the three bank witnesses has been already summarized. None of them knew decedent's nephew until the time of the interviews and one of them did not remember meeting him even then. None of the three knew the decedent until the interviews except perhaps for seeing her in the bank years before. Appellant's argument that they cannot be considered independent advisers since they

"were there representing the interests of their respective banks" is difficult to follow. That very fact would seem to qualify rather than disqualify them as disinterested and independent advisers, when coupled with the fact that none of them was a friend of either joint tenant, or an "agent" of either (see *Rocha* v. *Rocha*, 197 Cal. 396, 408 [240 P. 1010].) Moreover, if they had any duty other than that owing to their respective banks it would seem that their natural leaning would be toward the protection of the interests of their depositor whose acts and conduct they had been sent out to carefully scrutinize.

The witness Muller was asked "You didn't give her any advice about what to do, you just asked her?" and answered "No. I just asked her what she wanted to do," but his testimony shows that he explained to her the meaning and consequences of a joint account.

The witness Phipps was likewise asked on cross-examination "Q. You didn't give the lady any advice about what she should do, did you? A. No. I gave her an explanation of the joint tenancy and the features of the transaction. Q. But you didn't advise her either to do it or not to do it, did you? A. No, sir."

The witness Mullin testified that he, too, explained to her the effect of the creation of the joint account, and told her what the other joint tenant could and could not do and that "she understood it thoroughly." On cross-examination he was asked "Q. Did you give her any advice at all? A. None at all. Q. Did she ask any advice from you? A. No, she seemed to be prepared to do a certain thing, and knew what she was doing."

The fact that none of the three volunteered any advice (in the sense of recommendation or suggestion) and that decedent asked for none, does not necessarily mean that she acted without independent advice. Had they proffered advice unasked they might easily have subjected themselves to criticism (see *Broaddus* v. *James*, 13 Cal.App. 464, 476, *supra*). They apparently were careful to refrain from leading questions, but inquired of her what *she* wanted. All that they volunteered was the explanation to her of a joint account and its operation, effect and consequences. This may fairly be called advice. She seemed to be already informed about joint accounts which is understandable as she had carried one with her sister, as the record shows (compare *Broaddus* v. *James, supra*, p. 476), but if she had required any information

or had entertained any doubt as to any feature of such accounts the bankers were there to inform her. Their presence at the very least afforded the opportunity for independent advice (*Estate of Cover, supra.*) The court, however, apparently determined that there was more than mere opportunity, as indicated by its finding that she had independent advice.

In a dictum in *Johnson* v. *Studley,* 80 Cal.App. 538, 555 [252 P. 638], a somewhat similar situation was presented. The court said:

"The trial court, in its decision, as do counsel for the respondent in their brief, stresses the proposition that the deceased, in carrying out the transactions, was without independent advice as to the nature and consequences to him of the proposed agreement. The undisputed evidence shows, as has been pointed out above, that Mr. Horton, president of the bank with which the deceased had for many years deposited his money, explicitly explained to the deceased, before the agreement was consummated and prior to its being reduced to writing, that the effect of the agreement, if executed by him, would be to transfer his entire estate to the defendants, and advised him to consider the proposition well before accepting it. If, therefore, this were a case where the relation of the parties was of a fiduciary or confidential character, the advice or caution thus given deceased by Mr. Horton, in whom we may assume the deceased had full confidence, since he had extensive dealings with him as a banker, would entirely measure up to the rule as to independent advice in such cases."

The testimony of the three bankers, in our opinion, furnished a sufficient foundation for the finding that the decedent received independent advice.

In the instant case although independent advice is not indispensable, there was, in fact, such advice. It was "an important part of the evidence the weight and effect of which were committed to the judgment and conscience of the trial judge" (*Broaddus* v. *James, supra,* 13 Cal.App. 464, 475-6). As said in *Schurman* v. *Look,* 63 Cal.App. 347, 357 [218 P. 624], "[A]ffirmative evidence of independent advice furnishes a potent reason for sustaining the validity of a conveyance."

■  At the outset we recognized that the burden rested on respondents to overcome the presumption of undue influence. In *Khoury* v. *Barham, supra,* 85 Cal.App.2d 202, 212, the court said: "It was for the trial court to say whether the evidence offered . . . outweighs the presumption (*Smellie* v.

*Southern Pacific Co.*, 212 Cal. 540, 555 [299 P. 529] ; *People* v. *Chamberlain*, 7 Cal.2d 257, 260 [60 P.2d 299] ; *Lane* v. *Whitaker*, 50 Cal.App.2d 327, 330 [123 P.2d 53] ; *Fortier* v. *Hogan*, 115 Cal.App. 50, 58 [1 P.2d 23].)''

Eighteen witnesses testified in this case, and there was a great deal of testimony on both sides which we have not attempted to relate. The fact that appellant makes no claim of insufficiency of the evidence justifies confining the statement of facts to those only which illustrate the legal points, of which there are but two.

In addition to the bank accounts there was testimony respecting $3,000 or thereabouts which decedent had in currency in her home and turned over to her nephew after he told her that a frame house was no place to keep so much currency. It is sufficient to say that there was ample evidence to sustain the court's finding that decedent gave this to her nephew freely and voluntarily.

There is an abundance of evidence to have warranted the trial judge in concluding that decedent was very fond of her nephew and that he had always been very devoted and attentive to her, also that when decedent proposed these transfers into joint tenancy her nephew of his own volition and on the advice of his counsel as well, took care and pains to see that the transaction was subjected to the scrutiny of numerous persons.

In *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689], the court said: '' '. . . the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict.''

The judgment is affirmed.

Nourse, P. J., concurred.