[Civ. No. 15169.   First Dist., Div. Two.   Mar. 2, 1953.]

WELLS FARGO BANK & UNION TRUST COMPANY (a Corporation), as Administrator, etc., Respondent, v. MARIE L. BRADY, Appellant.

Tobin & Tobin, Charles R. Collins and Frank J. Fontes for Appellant.

Joseph Leonard, Appel, Liebermann & Leonard and Haskell Titchell for Respondent.

GOODELL, J.—Catherine L. Doran, a widow, died intestate on March 18, 1949, at the age of 83 years and 11 months. Her next of kin are Emily Wilson, a niece, appellant Marie L. Brady, a niece (daughters of a deceased sister of decedent), Byron Fowzer, Leroy Fowzer and Elinor Fowzer Morris, children of a deceased niece of decedent, and Cecil Chesworth, the only child of a deceased nephew of decedent.

Shortly before her death decedent had on deposit in four San Francisco banks $81,069.81 distributed as follows: in The San Francisco Bank $14,927.58; in The Hibernia Savings & Loan Society $22,505.26; in The Anglo California National Bank $22,222.69, and in the American Trust Company $21,414.28.

On February 11, 1949, decedent, accompanied by appellant and defendant Georgette Irwin (appellant's daughter) called at all four banks and effected the transfer therein of the accounts from her individual name into the names of Catherine L. Doran, Marie L. Brady and Georgette Irwin, as joint tenants.

Respondent bank was appointed administrator of decedent's estate and promptly commenced this action to recover for the estate the $81,069.81 so transferred, alleging the unsoundness of mind of decedent at the time of the transfers, and undue influence and fraud exerted on decedent by appellant and defendant Georgette Irwin.

The trial took 14 days and the record is voluminous. A jury heard the evidence and rendered four special verdicts all adverse to the defense. After the jury had retired to deliberate the judge announced his purpose to treat the verdicts, whatever they might be, as merely advisory, and his intention to make findings. This was done and a judgment was entered for $81,459.13 against both defendants. A new trial was denied, and this appeal was taken by defendant Marie L. Brady but not by defendant Georgette Irwin.

The four banks were joined as defendants and filed answers, and the judgment runs against each of them for the respective amounts on deposit, but it is conceded, of course, that the banks are merely stakeholders.

Appellant's answer shows that on March 21, 1949, she caused to be transferred by all four banks "the balances standing to the credit of the aforesaid joint bank accounts to new accounts opened in the name of" appellant alone. The evidence shows without contradiction that this was done without the knowledge or consent of the other surviving joint

tenant, defendant Georgette Irwin, and without disclosing to any of the banks the fact that Catherine L. Doran, the other joint tenant, had died three days before.

Appellant filed a cross-complaint against her codefendant daughter wherein she alleged that on February 11, 1949, decedent advised appellant that she desired to go to the banks and arrange to have her accounts put in appellant's name and that if anything happened to decedent she desired appellant to have her property, and requested appellant to accompany her to the banks for that purpose; that in April, 1948, appellant had been seriously ill and since then had been in extremely poor health and, in addition, was not familiar with business transactions of the character requested of her by decedent and did, therefore, call her daughter, Georgette Irwin, requesting that she take decedent and appellant to the banks for the purpose of making the transfers; that Mrs. Irwin on said day came to appellant's home and at once and prior to the making of any transfers . represented to both decedent and appellant that her own name should be placed on the bank accounts as a joint owner, inasmuch as appellant was in poor health, and that should anything happen to appellant, she could then take care of the moneys in the bank accounts for the family of appellant, and at said time Mrs. Irwin represented and held out to decedent and appellant that the name of Georgette Irwin should be placed on said bank accounts for the sole purpose of taking care of the moneys in said bank accounts for the family of appellant should appellant predecease decedent; that Mrs. Irwin is a woman of business experience and advised and importuned decedent and appellant to have her name placed on the new bank accounts as a joint owner for the purposes aforesaid and for no other purpose.

Appellant alleged further in her cross-complaint against her daughter that both decedent and appellant relied on such representations and, believing them to be true, agreed to the placing of her name on the bank accounts as a joint owner, but solely for the purpose so represented to them by her; that neither decedent nor appellant would have permitted Mrs. Irwin's name to be placed on the bank accounts as a joint owner if said representations were not made by her as alleged and relied upon by decedent and appellant.

She alleged further that immediately after decedent's death Mrs. Irwin made claim to the moneys standing to the credit of the joint bank accounts, demanded of appellant the passbooks

therefor, and, in fact, forcibly took the same from the home of appellant but shortly thereafter returned them; that appellant upon the return of the passbooks, and because of the asserted claims of her daughter to the moneys standing to the credit thereof, contrary to the latter's representations made at the time the joint accounts were opened, immediately went to the various banks and transferred the balances standing to the credit of the joint bank accounts to new accounts opened in the name of appellant alone; that the total amount of moneys standing to the credit of said joint accounts, and so transferred to the name of appellant alone was $80,869.81. She then alleged that her daughter claims to be the owner of the moneys now standing in the various bank accounts in the name of appellant, or claims some right, title or interest therein or thereto, but such claims are wholly without right and that appellant is the sole owner of all funds standing to the credit of said bank accounts.

The prayer of appellant's cross-complaint is for a judgment that she is the owner of all the money and that her daughter "has no right, title or interest in or claim to all or any portion of the moneys . . . and that said cross-defendant be forever enjoined and debarred from asserting any claim whatever thereto."

In answering her mother's cross-complaint defendant Georgette Irwin denied certain of its allegations, and alleged that on March 21, 1949, appellant, without the knowledge or consent of herself, had caused the $80,869.81 remaining in the four joint tenancy accounts to be transferred from those accounts into four bank accounts in appellant's sole and individual name, but that such funds so transferred nevertheless "remained the joint tenancy property of cross-plaintiff and cross-defendant." She asserted her right, title and interest as a joint tenant with her mother in all four accounts.

Georgette Irwin filed a cross-complaint against her mother, wherein she made substantially the same claims and assertions of title as those just stated, with the prayer that her right, title and interest as a surviving joint tenant (with her mother) be adjudged as against her mother's assertion of individual and total ownership of all four accounts.

A separate set of findings was made by the court on the issues raised on both cross-complaints and the answers thereto, wherein, *as between the appellant and her daughter,* the court found in favor of the mother and against the daughter.

Appellant's principal contention is that the findings of unsoundness of mind, undue influence and fraud are not supported by substantial evidence.

Before discussing the occurrences of February 11, 1949, and the situation just before and just after that day, there are certain antecedent matters which should be stated.

Decedent carried at least one of her bank accounts in the name of Katie L. McCarthy. She carried her accounts in The San Francisco Bank in the name of Katie Longmoore (a fictitious name which she adopted for some reason of her own) and she seems to have been known in that bank by that name and not Doran.

On her husband's death in 1907 she went to live with her sister, Mary Chesworth, and for over 20 years, until the latter's death in December, 1928, lived with her. Thereafter she lived by herself except for brief intervals when she lived either with her niece, Emily Wilson, or with her niece, appellant Marie L. Brady.

Decedent had an account in The San Francisco Bank in the name of Katie Longmoore, and on November 18, 1935, she withdrew $15,000 therefrom and with it opened in the same bank five separate accounts of $3,000 each in the names of Katie Longmoore, trustee, for each of five collateral relatives, namely, said niece Marie L. Brady, said niece Emily Wilson, George Chesworth, a nephew (since deceased), Robert Brady, a grandnephew, and Georgette Boye (now defendant Georgette Irwin), a grandniece. The materiality and bearing of this transaction is that on December 13, 1944, decedent withdrew appellant's $3,000 from her trustee account and turned it over to her outright. This was at the time when appellant was purchasing the property at 2566 California Street which became the Brady home, and it is the thory of the respondent, stressed throughout its brief, that from that time until decedent's death she was possessed of the fixed idea that her contribution or gift to appellant of this $3,000 toward the purchase of her home entitled decedent to some kind of right therein. Declarations and conduct of decedent herself lend support to this theory and other evidence in the record does likewise, including a declaration decedent made to a city physician just two days before her death. These matters are discussed later.

Among the other preliminaries, and somewhat remote from the immediate period surrounding the opening of the joint tenancy accounts, is the incident when appellant filed in the

superior court a petition for the commitment of decedent as a mentally ill person. That was on December 31, 1945, a little over three years before the transfers in question. Decedent was taken to the San Francisco Hospital, subjected to the usual examinations there by the two physicians on the board of examiners, and returned within a few days without any commitment or parole or any official action other than the court's determination that she was not mentally ill and its dismissal of the proceeding. A few days thereafter decedent closed out the two trustee accounts (of $3,000 each) which since 1935 had stood in the names of appellant's son and daughter.

This brings us to the period immediately preceding the transfers in question.

About February 8, 1949, decedent moved to the home of appellant from the place where she had been living at 2546 Pine Street. Her living quarters at the latter place had been in a basement apartment which was extremely untidy and in disarray, not to say squalid, the condition of which supplied much evidence of the occupant's eccentricity, to say the least.

On October 28, 1948, while living on Pine Street decedent sustained injuries, the cause of which is not shown by the record and probably is not known to anyone connected with this case. She was found on the floor of her quarters lying in a pool of blood and with a black eye. A thud or fall was heard by one of the tenants living on the floor above and one of them discovered her and called the police, and she was taken to the emergency hospital in an ambulance but returned within a couple of hours in a police car. There was speculation as to whether she had been robbed and beaten or had accidentally fallen. That was a little over three months before she made the transfers in question.

About February 8, 1949, decedent moved from her basement apartment at 2546 Pine Street to appellant's home at 2566 California Street.

On February 11th appellant telephoned to her daughter, Georgette, who lived in Lafayette and she, at her mother's request, drove over to the Brady home where the decedent, appellant and Mrs. Irwin conferred respecting the proposed transfers. The creation of the joint tenancy bank accounts was the suggestion of defendant Georgette Irwin, who as already appears, was a businesswoman. (She conducted a

large real estate office in Contra Costa County and had been
in business for about 10 years.)  The daughter then drove
her mother and decedent to the Fillmore Branch of The San
Francisco Bank where the first transfers were made.  When
it appeared that their mission was to open a joint tenancy
account they were turned over to Irving E. Redmond, an
assistant cashier and the assistant manager of the branch,
who had known decedent for several years, and he explained
the *modus operandi* to the three women.  His testimony is
given elsewhere in some detail under a separate head (dealing
with independent advice).  He testified, however, that at this
meeting "Mrs. Brady was the one that took the lead in the
matter"; it was she who talked to him first and told him that
decedent wanted to set up the joint account.  They were there
about three-quarters of an hour because at that bank there
were three or four accounts to merge.  He fixed his conversa-
tion with decedent as lasting about five minutes.  He testified
that "Mrs. Irwin happened to be at that particular day in
very much of a hurry.  She was very nervous at the time,
wanted to get out of there as quickly as possible . . ."  On
cross-examination he testified: "Q. And it appeared to you
that Mrs. Irwin was in a hurry?  But you weren't hurried,
were you?  A. Well, it didn't make it very convenient for
us, I can assure you of that.  Q. I mean you took what time
you deemed necessary to explain this transaction to Mrs.
Doran?  A. Oh, yes, yes, we took time.  At the same time
we had to rush because of Mrs. Irwin."  He also testified:
Q. Did Mrs. Longmoore say to you, Mr. Redmond, 'These are
my people, and they are going to care for me, and my money
is going to them on my death'?  A. I can't remember whether
that conversation took place in that substance.  Q. Well, per-
haps it wasn't in those words, but was it in that substance?
A. That is correct."  And further: "Q. Now, you stated in
your direct examination that Mrs. Doran told you that her
object was to have these people pay her bills, because she
might become incapacitated, that is correct, is it not?  A. That
is correct.  Q. And that was the object Mrs. Doran expressed
to you in setting up this account?  A. Mrs. Longmoore.
Q. Mrs. Longmoore?  A. Yes.  Q. Now, didn't Mrs. Long-
moore also say to you at that time, when she said that these
people were going to take care of her and pay for her bills,
that she was willing to rely on them?  A. Yes, sir, that is
correct, that's right.  Q. And in explaining this to you . . .
she said she might become incapacitated, and that these people

were to handle the account for her, and she was willing to rely on them, that is the substance of her conversation, was it not? A. That is correct.''

It appears without dispute that in the process of filling out the bank's record cards appellant did the writing, since decedent was unable to do so.

After leaving the Fillmore Branch the three women visited the Anglo Bank, the Hibernia Bank, and the American Trust Company where, in each instance, decedent's individual account was transferred into a joint tenancy account in the three names. Appellant testified that at each of these three banks her daughter took the initiative. She used the expression that her daughter ''engineered all the transactions'' while appellant sat with decedent, at each bank. It seems to be agreed that at none of the three banks was there any such lengthy explanation as that given by the witness Redmond.

Adolph L. Pierotti, assistant vice-president of the Anglo Bank and manager of its Market and Jones Branch, attended to the transfer there. He knew the decedent, and testified that when she entered the bank ''she was kind of assisted''; that when he went over to talk to her she told him she was ''Not so good, that she had been sick, she wasn't able to get around very well'' and that ''she had been fine until just recently'' and that ''She said she couldn't take care of her business very well at that time, and that is why she wanted it transferred.'' She sat at a desk and the papers were brought over for her to sign. When asked if she spoke coherently he answered ''No. Kind of slowly . . . That is all, just as a feeble person would speak, sort of a feeble voice, and spoke weakly,'' but intelligently. He ''thought she was of sound mind.'' He did not explain to decedent the method of making the transfer and there was no talk or comment at all about the joint tenancy account itself.

After visiting the four banks the three women returned to appellant's home. Mrs. Irwin testified that on getting back decedent said: ''Thank goodness, I will never have to leave this house again until I am carried out, thank goodness somebody else is tending to my affairs.'' Respondent argues that this statement is proof that appellant had insisted upon the transfers if decedent was to stay in her home and that decedent harbored the belief that she would have the right to remain in the Brady home the rest of her life. And in connection with the same argument respondent points to Mrs. Irwin's testimony that decedent knew that ''no one would

take care of her unless she . . . paid for it one way or another, and she stated that . . . whoever would take care of her would be the recipient of her funds.''

With respect to the new joint tenancy bankbooks Mrs. Irwin testified that on arriving from the banks at the Brady home she ''automatically, as a dutiful daughter, gave them to my mother.'' Appellant put them in a drawer in an upstairs room.

The next day, the 12th, Mrs. Irwin came to the Brady home and told her mother that she was going to take the books, and her mother ''objected quite strenuously''; her father also objected; but she ran upstairs, followed by her mother, and took the books, put them in her pocket and left the house with them several hours later. She did not tell decedent that she was taking the books. That same evening she came back to San Francisco and her husband returned the books to appellant while she remained outside in their car. While she had possession of the books she made notes from them for her own information.

Emily Wilson, a sister of appellant and a niece of decedent, testified that on February 12th appellant telephoned her that decedent was staying with her and if she wanted to see her, she was welcome to come over, and on the 16th she called at the Brady home. After lunch, while appellant was out, a representative of the Laguna Honda Home called and asked for Mrs. Doran. He questioned her with respect to money matters and then told her that she needed a rest, but that ''Nobody can put you in the Laguna Honda Home unless you want to move in.'' The witness said decedent was very upset and excited and said she didn't want to go into a home. The result was an argument between decedent and Mrs. Wilson and the former told the latter to get out.

On February 25th George Chesworth, the brother of appellant and of Mrs. Wilson, died, and appellant notified Mrs. Wilson by telephone. Mrs. Wilson knew that decedent had set up a $3,000 trust fund for him (as for herself and the others) some years before and she asked appellant '' 'Ree, do you think you could get Kitty to send the money to Ida, she probably needs it, maybe she will bring George's body up here and be buried in Holy Cross Cemetery with the rest of the folks.' And she replied: 'That cold blooded object wouldn't give anybody anything.' '' The trustee account in favor of George Chesworth ($3,398.11) had been closed out two weeks

before on February 11, 1949, and merged in the three-name joint account in The San Francisco Bank.

Mrs. Wilson was asked whether appellant had, prior to decedent's death, mentioned anything to her about the joint tenancy transfers, and answered in the negative.

Mrs. Wilson next saw decedent on February 27th, when decedent called at the Wilson home. She testified that decedent had said that she wanted Mrs. Wilson and her husband to have her money and wanted Mrs. Wilson to buy a home and take her in "And she told me how she had to hide her money" and to put chairs against the doorknobs, and quoted certain other statements susceptible of the interpretation that she was suffering from hallucinations of a paranoic nature with respect to the Brady family. She told Mrs. Wilson of an argument she had had with appellant that same day. Mrs. Wilson telephoned appellant who confirmed this, detailing certain occurrences which could have been interpreted as extremely eccentric conduct, to say the least, on decedent's part. Mrs. Wilson testified that the decedent's physical condition was very weak on this occasion and her conversation rambling and all in the past. On the way home she repeated that "she wanted to give my husband and I her money, she didn't want the Bradys to get any part of it." Mrs. Wilson testified that she had no idea what decedent's bank accounts amounted to.

Mrs. Wilson next saw decedent at the Brady home on March 13th. She testified that "when we were sitting there there was a lull in the conversation, and my aunt pointed to Mrs. Brady and she said, 'That thing is mad at me.' I said, 'Why?' . . . and my aunt said, 'Because I wouldn't give her daughter some money for a development project.'

"I turned to my sister and said, 'What on earth is she talking about?' And she said, 'Georgette wanted to borrow some money from her, and . . . she refused to give it to her.' Q. Did Mrs. Doran say anything about Georgette? . . . And I said, 'How is Georgette?' And my sister said, 'She is fine.' And my aunt says, 'Yes, how is Georgette?' She says 'I haven't seen her around here since I have been here.' And my sister said, 'Oh, she wouldn't come any place where you are.' " And then the subject of Georgette was changed. Further: "Well, my sister told me not to have anything to do with any of Kitty's money, if I did I would regret it. She said, that she had regretted taking the $3,000. Q. Did she say anything about having anything more than the $3,000? A. No. Q. Now, after you were there for a while did you and

Kitty go any place together? . . . A. All that afternoon Mrs. Brady kept telling my aunt she was going to have her taken to the San Francisco Hospital for observation, that she was going to have the furniture man come and take her junk out of there, and that she would have to pay for it. . . . Kitty says, 'That thing wants to put me in the nut house again.' I said, 'Kitty, don't worry, nobody will put you in the nut house again, because,' I says, 'this time I will be at court.' ''

Mrs. Wilson then testified: ''My aunt asked me if I would take a walk down to Foster's and have a cup of coffee with her. She turned her back on Mrs. Brady. She opened her handkerchief. She had a few dimes there and a comb, I believe. Mrs. Brady was on the other side of the room, and she came across the room hurriedly to see what my aunt had in the handkerchief . . . then Kitty couldn't remember where she had put her shoes. I had got her a pair of shoes, but the heel was a little higher than the shoes she was accustomed to, and she had a bad fall that morning, so I told her she better change her shoes and put on the ones she had been wearing that had newspapers in the sole. She couldn't remember where she put them. So we looked around for a while, and we found them . . . Then Mrs. Brady said if my aunt went out the front door she wouldn't get back in again. So we left anyhow, and my aunt's ankle bothered her from the fall in the morning. So I said, 'Well, Kitty, maybe we better not walk to Foster's, maybe you better go on back to the house and rest. But,' I said, 'if you go back there and Ree doesn't let you in,' I said, 'get in touch with Miss Shea and have her phone me.' I said, 'If I am not home, tell her to keep trying, and,' I said, 'no matter what time of night it is I will come over.' '' Further: ''She asked me if I would stick by her. I took her face in my hands and I said 'You know I will.' And she says, 'Don't leave me to the mercy of the Bradys.' And I said, 'I will go around tomorrow to the real estate offices and see what I can do, and I will phone you tomorrow night.' ''

That was the last time Mrs. Wilson saw the decedent alive. However, on the 18th, the morning of the day of the death, she had a telephone conversation with appellant as follows: ''Mrs. Brady phoned me and . . . she said she had quite an argument with Kitty the day before, that Kitty cursed her. And I said, 'Well, that was very foolish.' She said that Kitty wanted to go to a Mrs. Miller, and I said, 'Well, if that is what she wants, why not let her go to Mrs. Miller?' And my sister said she didn't know where she lived. And I said, 'I am

sure you can get the forwarding address from the people that was living in her flat.' "

On March 16th the Social Service Department of the city received a call from 2566 California Street which was relayed to one of the city physicians, who promptly called that day at that address. When admitted at the Brady home he was told that "They wished to give me the information regarding the patient that was living with them." After some preliminaries he testified respecting the two persons with whom he talked, as follows: "These two individuals instructed me that they could no longer take care of a certain patient, or a certain woman that was living with them a Mrs. or Miss Doran. And that her mental faculties had seemed to leave her, and she was incompetent mentally, and it was impossible for them to handle the situation any longer, and desired for me to recommend for her permanent care at the Laguna Honda Home . . . and I instructed them I couldn't do that without examining the patient, that was a necessity. . . . Q. . . . Will you explain to the Court and the jury what Laguna Honda Home is? A. Well, it is established by the taxpayers of this City and County for the care of the old and aged people who are indigent and cannot afford a private nursing home. They have two departments there, one for the ambulatory who are apparently still able to take care of their natural wants, and they have another department for the incurably ill, bed fast cases. There are two departments. Q. And these people then said to you they wanted you to recommend Miss or Mrs. Doran be placed within this home, is that correct? A. Yes, sir. Q. Was there anything else said at that time in that connection? A. I told them that I would have to examine the patient before I could make any recommendation. And it was then and only then that they stepped out of the room and brought this patient into the living room for the purpose of having me look at her."

When they brought her in she seemed to the doctor "rather disturbed." He added: "She wanted to know who I was, what I was doing there. So I took it for granted she didn't know why I was there. And when she found out, when I told her the reason, the purpose of my visit, she became extremely agitated. Not at me . . . She was very much annoyed, and she immediately flew into a rage and accused these two people who were in the room there with me, of being very unkind and unjust to her. She turned to me and said, 'Doctor, you don't know the circumstances, but I will tell you, I have given these

people several thousand dollars to pay their mortgage, and this is the gratitude I am getting. They want to put me in the Old People's Home,' I assured her that nobody could do that without her permission, and it went on and on for ten or fifteen minutes, until I took my leave. Q. Now, you say she told you she gave these people several thousand dollars. Do you recall the figure she mentioned? A. Somewhere in the neighborhood of three or four thousand. I don't know exactly. In the neighborhood of three or four thousand. Q. What did these people say in reply to that statement? A. They assured me in her presence that she didn't know what she was talking about, that she was incompetent, and things along those lines. And the more they talked along those lines the angrier the old lady got, and assured me she knew just what she was talking about. Q. Did they say anything about this statement that the old lady had given them three or four thousand dollars to pay a mortgage off on a home? A. They denied that, in my presence . . . Q. Which one of them said the old lady didn't know what she was saying? . . . A. They both said that, and assured me she was mentally incompetent . . . Q. Did they then and thereafter urge you to go ahead with this proceeding, Doctor? A. No, I explained to them that a Social Service investigation would be absolutely necessary before anything could be done, and instructed them that I would notify the Social Service and recommend relief home ambulatory as they suggested, but before she would be taken, a complete investigation as to her financial status must be made by the Social Service. When I informed them of that fact I was told to forget about it, about the recommendation for relief home.''

The doctor testified that his conversation with decedent was very brief, only ''a few words. The conversation existed only between her relatives and herself—the old lady . . . Just a dog fight.''

The decedent died two days later.

There is considerable evidence (from lay witnesses, it is true) that following her injury on October 28, 1948, decedent failed both mentally and physically. She told Mr. Pierotti at the bank at the time of the transfer that ''she had been fine until just recently,'' and his observation was that she did not speak coherently, but feebly and weakly. The witness Ramirez, who lived on the floor above decedent on Pine Street, and who had habitually visited with her as she sat on the front steps, testified that ''after the accident she was not herself

at all, absolutely, she was a different type of a person.'' She would accuse persons of whom she was very fond, of stealing things from her; she would ring the doorbell of his flat for the purpose of using the telephone in the middle of the night, and had to be dissuaded from telephoning. Her condition, he said, after December was ''worse, absolutely. After the accident the lady was never the same.'' The same witness testified that when she moved from Pine Street to the Brady home ''the lady disappeared, because nobody ever know where she went. It was a week before we know she moved to California, she never told it to anybody.'' Decedent's niece, Emily Wilson, testified that the last time she saw her aunt on Pine Street was on February 8th, at which time she had said nothing about moving to the Bradys', and she first learned of it on the 12th, when appellant telephoned her.

The witness Cantrell also testified that after the October 28th injury decedent's mental faculties were impaired. He also testified that on the night of October 28th when decedent was injured, on her return from the emergency hospital about 11:30 he and his aunts (who owned the Pine Street house) were confronted with the problem of decedent's care since she was in shock. One of his aunts telephoned Mrs. Brady who replied that they had gone to bed. He took the phone from his aunt and asked appellant ''if she realized her aunt might have been seriously injured, and if she expected my old aunt, just around 90, and myself to stay up all night long and take care of her. I stated, 'You have absolutely got to come over here now; we have been imposed upon long enough.' She says, 'All right, . . . I will be over.' '' She came over in about an hour.

There was testimony respecting decedent's forgetfulness and instances of it were cited. There also was testimony respecting decedent's changing attitudes toward friends and relatives— at times showing fondness and affection toward them, and then showing bitterness, antipathy and distrust toward the same persons. Illustrative of these changing moods at a time very close to the day of the transfers is the incident of February 16th in the Brady home when decedent ordered her niece Emily out, followed 11 days later by her visit to Mrs. Wilson's home when and where she told her that she wanted the Wilsons to have all her money and the Bradys to have no part of it— from which, incidentally, the inference could also have been drawn that the transfers made two weeks earlier had passed entirely from her memory. The same may be said respecting

the doctor's visit on March 16th when decedent mentioned the $3,000 transaction of four years before, but said nothing about the $81,069.81 transaction only five weeks earlier.

The fixed idea held by decedent with respect to her right or interest in the property at 2566 California Street is touched on repeatedly throughout this record (of almost 1,000 pages). The subject was of importance insofar as it shed light on whether anything said or done by defendants respecting this property might have influenced decedent in creating the joint tenancy accounts.

A police officer who had been called by appellant on March 12, 1949, because decedent was in the street in her nightgown (and one of the officers who had responded to the Pine Street call on October 28th) testified that on March 12th decedent told him that the Brady home "actually belonged to her, and that Mrs. Brady was just waiting to get the house away from her" whereupon Mrs. Brady "told me . . . not to pay much attention, that she was old and suffering from hallucinations." On the same occasion decedent told the officer that "she gave Mrs. Brady $3000." The witness Cantrell testified that decedent had told him on several occasions that she had advanced $3,000 to the Bradys to purchase some property, a residence, and that they had not fulfilled their obligation. Mrs. Wilson testified to an occasion when decedent was walking to the bus with her, decedent had said " 'Let's go past the Bradys' . . . I like to go past there because . . . I have a $3000 interest in that house and it will be mine some day.' She meant hers." On Mrs. Wilson's visit on February 12th decedent told her that "she had $3000 invested in that house." A 15-year-old boy who lived across the street from the Brady home testified that in 1948 on several occasions he saw decedent standing in front of the house—2566—just looking at it, "And a few times she wanted to try to get in." Defendant Georgette Irwin when asked who first mentioned the names that were to go on the joint accounts answered: "I don't believe that anyone came out and actually said that my mother's name was to be put on there, but I believe that it was more or less taken for granted, because Mrs. Doran just, more than anything in the world, wanted to live in that house."

She also testified: "Q. Did Mrs. Doran express a desire to move some place where she could be taken care of? A. Yes."

Also: "Q. Who suggested that your mother's name go on the books? A. She wanted to live at my mother's house, and

if she wanted to live at my mother's house that was just the automatic conclusion.''

Further: ''Because Mrs. Doran stated that she wanted to stay at that house, that left my mother the logical one. I don't remember whether it was actually said in words, but——Q. What do you mean, 'the logical one'? A. The logical one to have her money if she wanted to live in that house. That would be the logical thing to do, wouldn't it? Q. And she did live there continuously thereafter until her death? A. Yes.''

The foregoing summary was made in the light of the familiar rule restated in *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689], where the court said:

'' 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pac. Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict.''

On the issues of undue influence and fraud the findings are as quoted in the footnote.*

---

*''It is true that on the 11th day of February, 1949, Catherine L. Doran was old and feeble and . . . unable to protect herself against imposition by reason of her physical and mental weakness . . . It is true that on February 11, 1949, defendants . . . knew that Catherine L. Doran was aged and infirm in mind and body . . . The said defendants . . . also knew that Catherine L. Doran was unable to resist imposition . . . It is true that on February 11, 1949, defendants . . . represented to decedent that she should transfer her funds to joint tenancy accounts with them so that said defendants . . . could look after the needs and wants of said decedent since she was no longer able to attend to her own affairs. The said defendants . . . further told and represented to said decedent that the transfer of her funds into the joint tenancy accounts would safeguard and protect her property and would be for the benefit of said decedent and that the funds therein deposited would remain the property of said decedent and her estate. It is true that said defendants . . . further represented and promised said decedent that if she would transfer her funds in the manner aforesaid, she could live in the home of defendant . . . Marie L. Brady for the rest of her natural life and that said defendants . . . would personally look out

There is no doubt that there is substantial evidence to support the findings on those two issues.

"Undue influence consists: 1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; 2. In taking an unfair advantage of another's weakness of mind; or, 3. In taking a grossly oppressive and unfair advantage of another's necessities or distress." (Civ. Code, § 1575.)

One of appellant's contentions is that respondent neither pleaded nor proved that a confidential relation existed between decedent and herself. The court found that decedent reposed trust and confidence in the defendants, and it is argued that such finding is not supported by substantial evidence. While in actions of this type the subject of confidential relations is often one of major importance, we do not so consider it in this case. ▆ In *Buchmayer* v. *Buchmayer*, 68 Cal.App.2d 462, 467 [157 P.2d 9], the court in discussing subdivision 2 of section 1575, says: "In the second class of cases the existence of a confidential relationship is not a necessary element, although weakness of mind of the person imposed upon is such an element." ▆ There is ample evidence in this record to support the finding of undue influence based alone on decedent's weakness of mind on the

---

for the care and wants of said decedent. Each and all of the above representations were untrue and were known by said defendants . . . to be untrue at the time of making them. The defendants . . . did not intend to permit said decedent to live in the home of defendant . . . Marie L. Brady for the remainder of her natural life, nor did they intend to look after the needs and wants of said decedent, but on the contrary . . . intended to remove said decedent from the home of said Marie L. Brady as soon after the transfers were effected as they could do so. The defendants . . . knew that the transfer of her funds . . . would purport to vest title to said funds in said defendants . . . as joint tenants with right of survivorship and enable said defendants . . . to withdraw and possess themselves of said funds. It is true that said representations and each of them were made by said defendants . . . for the purpose of gaining control of the funds of said decedent during her lifetime and of securing the whole thereof upon her death for themselves to the detriment of said decedent and of her estate and those interested therein. It is true that said representations were made by said defendants . . . with intent to deceive and defraud said decedent and her estate and those interested therein of said moneys and were made with the further intent that said decedent should rely thereon. At the time of making said representations said defendants . . . intended to secure and convert to their own use and benefit the moneys and property of said decedent. It is true that the decedent relied upon the said representations . . . and would not have allowed or permitted said transfers to take place if said representations had not been made . . ."

day of the transfers although it may be largely circumstantial in character. "Direct evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all the facts and circumstances. Taken singly the facts or circumstances may be of little weight, but taken collectively they acquire their proper weight and may then be sufficient to raise a presumption of undue influence." (*Estate of Hannam*, 106 Cal.App.2d 782, 786 [236 P.2d 208].) See, also, *Fross* v. *Wotton*, 3 Cal.2d 384, 393 [44 P.2d 350], and *Taylor* v. *Osborne-Fitzpatrick Finance Co.*, 57 Cal.App.2d 656, 661 [135 P.2d 598].

That the trial judge had this rule in mind is shown by his apt comment: "No matter how you look at those things, it all boils down to three issues, doesn't it, since the question of incompetency is one, the question of undue influence, and the question of fraud. All those things can be proven or disproven by bits and items, however small or infinitesimal."

If the evidence is sufficient to support the finding of weakness of mind it is not necessary to now determine whether the finding of a confidential relation is supported since it is definitely settled that "if a judgment is amply supported by findings which are unobjectionable, findings on other issues become immaterial, and it is not ground for reversal that such other findings are unsupported by evidence, or are uncertain or otherwise defective." (2 Cal.Jur., pp. 1028-1029, quoted in *Porter* v. *Miller*, 201 Cal. 750, 754 [258 P. 595].)

We are satisfied that the finding of fraud is likewise supported by substantial evidence.

One of the elements of actual fraud (Civ. Code, § 1572, subd. 4) is "A promise made without any intention of performing it; . . ." There is abundant evidence from which the trier of fact could have concluded that decedent understood from the language and conduct of both defendants that she was to spend the rest of her days ("until she was carried out") in the Brady home. It is true that she did live there during the five weeks elapsing from the time of the transfers until her death but the testimony respecting the visit at the Brady home of the representative of the Laguna Honda Home on February 16th, five days after the transfers, and the doctor's call there on March 16th, about five weeks after the transfers, with respect to entry into Laguna Honda Home plus Mrs. Wilson's testimony that during her visit on March 13th "All that afternoon Mrs. Brady kept telling my aunt

she was going to have her taken to the San Francisco Hospital for observation'' presented the question whether a promise had been ''made without any intention of performing it.'' This case seems to belong to the class of cases mentioned in *Estate of Newhall*, 190 Cal. 709, where at page 718 [214 P. 231, 28 A.L.R. 778] the court said: ''Undue influence is not always the equivalent of fraud. One may exist without the presence of the other. The former, however, may, at times, be exerted and applied through the medium of fraud. Oftentimes the terms 'undue influence' and 'fraud' are used interchangeably. Thus it has been held that undue influence, even though exercised without the aid of actual fraud or fraudulent representations, is a form of fraud. (*Estate of Ricks, supra.*) It has also been held that undue influence may be exerted no less by fraudulent misrepresentations than by means of duress or other pressure. (*Estate of Snowball, supra.*)''

The court found that ''The decedent . . . did not have any independent or legal advice in connection with said transfers.'' This finding is strongly attacked by appellant as being wholly unsupported by the evidence. The witness Redmond explained joint tenancy accounts to decedent for about five minutes. For the purpose of the present discussion it may be conceded that his testimony, summarized in the footnote* might have supported a finding that decedent had had independent advice (if the court had so found) since it was somewhat similar to the explanations of joint tenancies given by the three banker witnesses which this court had occasion to consider in *Pfingst* v. *Goetting*, 96 Cal.App.2d 293 [215 P.2d 93]—with certain differences in the circumstances in which the statements were made, noted later. In the Pfingst case, however, the trial court found that the decedent was com-

---

*''I told her that if she was to transfer this account into a joint account, that either one of the three would have control of the account. I further went on to state that if they wanted to withdraw, that Mrs. Brady or Mrs. Longmoore or Mrs. Irwin could come into the bank and withdraw the money. Q. Did you make any statement concerning what would happen in the event of the death of any one of the parties? A. Yes, I did. Q. Tell the jury what you said? A. I told her also, that is, Mrs. Longmoore, that in the event of her death that the survivors would be entitled to the balance of the account . . . [that] a joint tenancy receiving the money, entitled all the parties to be able to withdraw the money. That was the way she wanted it taken care of. In other words, I told her also that they would be able to come in here and withdraw money for her or for themselves. And she stipulated very clearly to me and to the people present that that was her object, to have them pay her bills, that she might become incapacitated. Q. Yes, and during this conversation did Mrs. Longmoore act rationally or irrationally? A.

petent, and that there was no undue influence and that she had had independent advice. There the question presented was not so much whether she had such advice as whether the testimony of the bankers was admissible under the intimate acquaintance rule. This court held, as the trial court had, that it was admissible, and that it supported the finding of independent advice. Unlike that case, here the court found that decedent was of unsound mind, that there was undue influence and fraud and that she had had no independent advice. It would seem that the basis for the court's finding must have been the fact that Mr. Redmond's explanation was made in the presence of both defendants and after they had come to the bank with the avowed purpose of opening the joint tenancy account as announced by appellant. It has been held that to be independent, ''the advice should be given in private by someone of her own selection and when the grantor is not surrounded with the dominating influences favoring the transfer'' (*Nobles* v. *Hutton*, 7 Cal.App. 14, 23 [93 P. 289]; *Piercy* v. *Piercy*, 18 Cal.App. 751, 756 [124 P. 561]).

Moreover, ''independent advice is but a circumstance and is not necessarily a determining factor'' (*Burnham* v. *Witt*, 217 Cal. 397, 398-399 [18 P.2d 949]). See discussion in *Brown* v. *Canadian etc. Co.*, 209 Cal. 596, 599 [289 P. 613]; see, also, *Stevens* v. *Hutton*, 71 Cal.App.2d 676, 683 [163 P.2d 479]; *Munfrey* v. *Cleary*, 75 Cal.App.2d 779, 785 [171 P.2d 750] and *Helbing* v. *Helbing*, 89 Cal.App.2d 224, 229 [200

---

Rationally . . . Mr. Fontes: Q. I will ask you this: Did she speak coherently or incoherently? A. Coherently. Q. Coherently. Was there any statement made by either Mrs. Brady or Mrs. Irwin to Mrs. Longmoore, importuning her to make this—rather, to create this bank account, or any statement urging her to do so? A. Not to my knowledge, not to my memory . . . Q. Explain to the jury just what steps are taken to consummate the transaction, do you know what I mean? A. Yes, I believe we had three accounts that we transferred, or four, into this joint tenancy account. That meant we had to have a signature of Mrs. Longmoore signed on each individual account, withdrawing it, or transferring it to the joint account. It also meant we had to have a signature card completed by the three parties on the new account, namely Mrs. Irwin, Mrs. Brady and Mrs. Longmoore. And Mrs. Brady [a slip of the tongue; he meant decedent] was not able to write all of the detailed information which we required on the reverse side of a signature card, so . . . Mrs. Brady completed the reverse side of the card for her, namely, her name, address, her date of birth, where she was born, mother's maiden name, and so forth. That particular transaction, I would say, transferring the accounts into the new account, took approximately three-quarters of an hour. Q. And were each of these steps explained to Mrs. Longmoore as to the various steps as to why you were doing these things? A. Yes, sir, they were.''

P.2d 560]. ■ Since independent advice is only a circumstance and not a determining factor, and for the reasons given in discussing the finding on confidential relations, we see no necessity to pass upon the question whether the finding that there was no independent advice is supported by the evidence (2 Cal.Jur., pp. 1028-1029, *supra*).

The court found that on February 11, 1949, decedent "was not of sound mind and memory." It also found that she "was unable unassisted to manage and take care of herself and her property . . . and was likely to be deceived or imposed upon by artful or designing persons" (see Prob. Code, § 1460). Much attention is given in the briefs to these two findings and many cases are cited by both sides addressed to this question. For reasons already given in discussing the findings on confidential relations and independent advice (2 Cal.Jur., pp. 1028-1029) we find it unnecessary to decide whether these two findings are supported. ■ To repeat: if the finding of undue influence based on weakness of mind (without total mental disqualification) is supported, as in our opinion it is, it is not necessary to go further and pass upon these findings on unsoundness of mind and incompetency.

Appellant makes several attacks on the instructions, but there is no necessity to examine them for the following reasons: After the jury had retired the court said to counsel: "We should agree now on the next step in this case, regardless of what the jury does, whether it brings in a verdict on any of the issues, all the issues, or none of the issues. The Court feels that the matter has to be concluded by preparation of findings and conclusions and the signing of a judgment."

This suggestion seems to have met with general acceptance since the record shows no controversy over it, and no point was made of it in appellant's opening brief.

■ At the conclusion of the trial appellant moved the court "to discharge the jury and to try the issues by the Court, on the grounds that this is an equitable proceeding, that the special issues would only be advisory, and that there is no evidence in any event to submit any issue to the jury." The court then said: "I believe it was intimated off the record a few days ago, that it would be stipulated by the plaintiff that—not stipulated, but it would be noted that they had waived their right for a jury trial as a matter of right" to which counsel for plaintiff replied: "Yes, your Honor." In

short the court determined to treat the four special verdicts (shown in the footnote*) as merely advisory. That being so, the language found in *Richardson* v. *City of Eureka,* 110 Cal. 441, 446 [42 P. 965] is apposite: "The verdict of the jury was merely advisory to the court, and if the instructions given to the jury were erroneous in any particular, as appellant insists they were, such error is not ground for reversing the judgment. The correctness of the decision of the court, and not the propositions of law it laid down for the guidance of the jury, is the question for determination in such instances. [Citations.]" See, also, *Scheerer* v. *Goodwin,* 125 Cal. 154, 159 [57 P. 789] and *Fisher* v. *Zumwalt,* 128 Cal. 493, 500 [61 P. 82]. For these reasons we are satisfied that appellant cannot at this late date press this point.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 30, 1953.

---

*"We, the jury in the above-entitled cause, find as follows:

"(1) Was the decedent, Catherine Doran, on February 11, 1949, incapable of understanding the nature and extent of her property and mentally incompetent to make a gift or transfer thereof? Yes or No [answered 'Yes.']

"(2) Was the decedent, Catherine Doran, on February 11, 1949, acting under the undue influence of Defendants Brady or Irwin, or either of them, in making the transfers herein sought to be set aside? Yes or No [answered 'Yes.']

"(3) Were the transfers of February 11, 1949, secured by fraud practiced upon the decedent by the Defendants Brady or Irwin, or either of them? Yes or No [answered 'Yes.']

"(4) Did Georgette Irwin secure the addition of her name as one of the joint tenants to the bank accounts created by Catherine Doran on February 11, 1949, by the exercise of fraud practiced upon decedent Catherine Doran? Yes or No [answered 'Yes.']"